

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00153-CV

_____

CONTRACT DATASCAN HOLDINGS, INC.; CONTRACT DATASCAN, LP D/B/A THE INVENTORY EXTRAS; AND GWYN NICOLE SNEAD, Appellants

V.

RETAIL SERVICES WIS CORPORATION D/B/A WIS INTERNATIONAL INC., Appellee

_____

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-341198-23

_____

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an interlocutory appeal from a temporary-injunction order (injunction order). In the suit below, Appellee Retail Services WIS Corporation d/b/a WIS International Inc. (WIS) sued Appellants Contract Datascan Holdings, Inc.; Contract Datascan, LP d/b/a The Inventory Extras (collectively, Datascan); and Gwyn Nicole Snead (Snead) for various causes of action tied to claims that Datascan had hired former WIS employees in breach of the employees' noncompete, nonsolicitation, and nondisclosure agreements and had induced them to breach their fiduciary duties by disclosing WIS's confidential information. The trial court issued an injunction order for WIS. In three issues with a host of subissues, Datascan makes three broad challenges to the trial court's injunction order: (1) challenges to the enforceability of the employees' agreements, (2) challenges to the adequacy of proof that WIS offered to establish its probable right to recovery on the causes of action that it had alleged, and (3) challenges to the form of the injunction order—alleging that it does not meet the requirements of Texas Rule of Civil Procedure 683 because it is overly broad and is vague in its restraints.[1]

We sustain Datascan's third issue complaining that the injunction order fails to meet the standards of Rule 683. Therefore, with respect to paragraphs b., e., f., g.,

_____

[1]The individual Appellant, Snead, did not file a brief but joined the brief filed by Datascan. *See* Tex. R. App. P. 9.7.

and h. of the injunction order's restraints, we reverse the injunction order and remand this case to the trial court for further proceedings consistent with this opinion.

We overrule Datascan's second issue and, with one exception, its first issue. Because we are remanding this case, we instruct the trial court to consider whether the restraint based on a broadly defined scope of activity in a noncompete provision of the former employees' agreements should be narrowed and reformed before being the subject of injunctive relief.

## II. Factual and Procedural Background[2]

### A. Factual background

#### 1. We set forth how the controversy at issue arose.

This matter involves a conflict between two companies that provide inventory services for large retailers, i.e., they are companies that count the merchandise of big box stores. Here, one customer of both inventory companies—Walmart—is at the center of the conflict.

---

[2]In this appeal, Datascan's and WIS's briefs and the reporter's record were filed under seal. The reply brief and clerk's record were not. To the extent possible, we have tried to generalize the description of the evidence referred to in this opinion to avoid revealing what the parties may consider confidential. However, we are obliged to write an opinion that addresses the parties' contentions. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Without guidance from the parties—other than simply sealing the record and briefs—we are left to reach our own balance between the need to address adequately the contentions raised and the parties' desire to preserve what they believe is confidential.

The controversy originated during a period when two companies—WIS and RGIS, LLC—competed to do Walmart's inventories. In 2021, WIS acquired RGIS. Apparently, wanting more than one option for an inventory-service provider, Walmart issued a Request for Proposal (RFP) in mid-2022, soliciting companies to make proposals for performing inventory services in its forty-six markets. Never having done inventory work for Walmart before, Datascan submitted responses to the RFP. The RFP process resulted in Walmart's dividing its inventory work between three providers: WIS was awarded thirty-five markets, Datascan was awarded seven markets, and a company named OSL was awarded the remaining four markets.

Walmart's inventories are conducted by teams of supervisors and inventory specialists, whose work is managed by multiple layers of managers. After the RFP process, Datascan began putting together teams to perform inventories in its newly assigned Walmart markets. How Datascan went about assembling the teams to perform its Walmart inventories is at the heart of the dispute. WIS contends that Datascan had to assemble its teams in short order and so it "poached" WIS managers who were directly involved in its Walmart inventory process. WIS further contends that Datascan did this to obtain WIS's confidential information as to how to conduct Walmart inventories and that Datascan knowingly induced the managers to violate agreements barring them from (1) taking employment with a company that competed with WIS, (2) soliciting its employees for a period of one year after they left WIS's employment, and (3) disclosing WIS's confidential information.

4

Snead, who was a Regional Talent Manager for RGIS, went to work for Datascan.[3] WIS sued Datascan as well as Snead because she allegedly solicited employees to join Datascan.

Datascan responds to WIS's allegations at a general level by contending (1) that it hired the Former Management Employees (FMEs) not because of their knowledge of WIS's confidential processes in conducting Walmart inventories but because of their abilities to manage the lower-level employees who conduct the inventories and (2) that it did not need or access any of WIS's confidential information. At a specific level and as we will detail, Datascan launches a multi-front attack on the legal bases for WIS's contentions and the injunctive relief granted by the trial court.

### 2. We set forth the structure of an inventory team and its management, as well as the movement of managers to Datascan that is the basis of WIS's suit.

As noted, the primary focus of the dispute is on the managers who left the employ of WIS or its affiliates and went to Datascan. The WIS management structure includes three levels of managers who operate under WIS's vice president of Walmart operations. In descending level of authority, these are Regional Managers, District Managers, and Area Managers. The managers are salaried employees. Below the managers are teams of hourly employees who hold the title of inventory supervisor

---

[3]Snead had been a district manager with RGIS before she became a Regional Talent Manager. She had signed an Employee Intellectual Property Agreement with RGIS in 2017.

5

and who have hourly inventory auditors working under them.  The migration of nine FMEs from WIS (or RGIS after it was acquired by WIS) is the suit's focus.

### 3. We explain the documents that allegedly bind the FMEs.

WIS contends that the FMEs are violating employment agreements they had with WIS or which protect WIS's interests.  With certain exceptions, the FMEs signed documents variously titled "Employee Intellectual Property Agreement" or "Restrictive Covenant & Confidentiality Agreement."  Generally, the agreements contained a broadly worded definition of "confidential information" that covered in part "the Company's sophisticated, state-of-the-art inventory service systems consisting of hardware and/or software for handheld computers, data compilation, data storage and data transmittal, and the know-how to create and implement such information (all such information is hereinafter referred to as the 'Confidential Information')."  The agreements prohibited the disclosure of confidential information to anyone "other than" the employer's personnel.

The documents also contained an agreement not to compete that limited the scope of the FMEs' activity for one year after leaving employment as follows:

> During the period of employment by WIS of Employee (the "Employment Period") and for a period of one year thereafter, Employee shall not, without the prior written consent of WIS, engage in any business activity or work that is in any way competitive with any Business of WIS (as defined herein) or perform any services for or sell, solicit, or attempt to sell or solicit any services to, or interfere with WIS's relationship with any person, company[,] or other entity that was a customer of WIS or was identified as a prospective customer of WIS during the period that Employee was Employed by WIS.

6

The geographic scope of this restriction in the agreements was generally "anywhere in the United States of America and its territories and possessions." Finally, the agreements provided that "[d]uring the Employment Period and for a period of one year thereafter, Employee shall not, directly or indirectly, induce any person employed by WIS to leave the employment of WIS."

### 4. We set forth the clashes over whether the FMEs' agreements bound the FMEs.

In the trial court, Datascan argued three basic points in support of its view that the FMEs are not bound by the agreements that WIS relies on to support its claims. Datascan then challenged whether the agreements, even if arguably binding the FMEs or protecting WIS's interests, are so broad in their restraints that they are unenforceable under Texas law.[4]

Five of the FMEs signed agreements with WIS.[5] The agreements were signed in the same time frame that WIS became aware that Walmart had awarded markets to Datascan. Datascan's first and second arguments regarding why the FMEs who signed these documents are not bound by them focus first on the time frame in which the agreements were obtained—that being the period when the processes of RGIS and WIS were being integrated. WIS claimed that it wanted to ensure that the

---

[4]For one FME, no agreement was introduced.

[5]One of the FMEs was a California resident, and due to California law, the agreement that she signed did not contain a covenant not to compete or a nonsolicitation provision but contained only a confidentiality agreement.

7

agreements were in place before the individual offices' financial statements, which were generated by the integration process that resulted from the acquisition of RGIS by WIS, were released to managers. As its first challenge, Datascan emphasized that the agreements introduced into evidence were not even signed by WIS. Second, Datascan noted that the employees who signed the agreements were already employed by WIS when they signed them and had received WIS confidential information long before signing the agreements. Because of this, Datascan argued that contrary to WIS's claim, WIS provided no consideration for the execution of the agreements in the form of the disclosure of additional confidential information after their execution.[6]

Third, several of the FMEs did not execute an agreement with WIS but had signed agreements only with RGIS before that company was acquired by WIS. In Datascan's view, these documents provided no protection to WIS because the agreements bound the employees to protect the information of RGIS, which used a different inventory technology than WIS's, and because the one-year noncompete period was from termination of employment with RGIS, not WIS. WIS countered this argument by noting that the RGIS agreements contained a provision making them applicable to "successors" and created protections for affiliates of RGIS, which WIS contends it became as a result of its acquisition of RGIS.

_____

[6]One FME who was tendered a WIS agreement refused to sign.

8

Turning to the restraints that the agreements contain, Datascan argued in the trial court (and carries forward the argument on appeal) that the agreements are unenforceable because two of their restraints are overly broad. Datascan first contended the agreements' scope-of-activity restraints were indefensibly broad because they prohibited the employment of the FMEs, not just for the customers for whom they had done work while employed by WIS and/or RGIS but also for "any business that is in any way competitive with the businesses of RGIS or WIS." Datascan also attacked the nationwide scope of the covenant's geographic restriction.

### 5. We explain the clash over what WIS claimed was confidential and what was actually confidential.

WIS cataloged as follows the information that it contended generally was confidential:

- Financial information such as "the profit[-]and[-]loss statements of each individual team, crew, district, whichever nomenclature you choose to use." This information was considered confidential because "it contains the revenue, the expense items that went in to performing that business, and then results in . . . either a profit or loss in a margin percentage in dollars."

- WIS's software platform.

- Payroll information because WIS's "people are compensated based upon their skill set and their level of experience, and that information contains

their tenure, their pay rates. And the district and area managers both already know the skill set level of those individuals because they're measured every day."

- The skill sets of the individual employees who conduct the inventories.

- Internal reports that "ensure that [WIS] meet[s] the expectations of Walmart[;] there are key underlying areas of the inventory that [WIS] establish[es] internal, for lack of a better word, parameters or guidelines upon what normal expectations should look like. And then . . . [WIS] use[s] software to draw exceptions out."

WIS asserted that it had safeguarded its confidential information by limiting who had access to it and by doing such things as password-protecting access to laptops and then requiring additional passwords to access financial information.

The main thrust at the temporary-injunction hearing regarding what WIS considered confidential was the "process of conducting inventory at Walmart." A WIS executive testified that Walmart's inventory process was different from that of any other retailer in America and that Walmart had "a very sophisticated process with very rigid parameters and expectations [that was], from a technological standpoint, more advanced than any other retailer's inventory program." The executive testified why the process was considered confidential:

> Well, I mentioned earlier that Walmart tells you what to do but not how to do it. So what we do with our management team and [what] we've

10

established over years of trial and error and on-hand experience is . . . [the most] efficient process possible to execute the inventory under the parameters that Walmart has given us, exceeding even their best expectations in terms of scoring.

And this is achieved through numerous steps including resource allocation, including internal reporting, all these things that are critical to the execution of the inventory.

According to the executive, these processes were constantly evolving.

The WIS executive also testified that the process piece of WIS's Walmart confidential information was independent of the inventory software that WIS utilized:

> Q. Okay. And . . . you were asked questions on cross-examination about your testimony earlier about the "what" -- what Walmart wanted you to do and then the how you did it, right?
>
> Do you remember that testimony?
>
> A. I do.
>
> Q. Okay. And then when you talk about management's execution and processes and procedures, that's the "how," right?
>
> A. Yes.
>
> Q. Is that confidential?
>
> A. Yes.
>
> Q. How much time has WIS spent developing the process and procedures that le[d] to the "how" it does its job for Walmart?
>
> A. That process has been developed over years.
>
> Q. That's independent of software, correct?
>
> A. Correct.

Another witness detailed the unique process entailed in conducting a Walmart inventory. During this witness's testimony, WIS's Walmart field manual was introduced into evidence and was described as a

> crew field manual that we put together. So Walmart gives us . . . a set of instructions, right, and so we basically take what they give us, and then we break it down to how we train our counters, the different processes, what to expect, how we run our flows, all those various things, but that is all included here in this manual.

The manual is not shared with Walmart or anyone other than WIS employees. Though the manual is a guide for managers, the counters and inventory specialists paid on an hourly basis may have access to it. However, if an hourly employee provided the manual to someone outside of WIS, that would violate WIS's code of conduct.

Datascan challenged whether the FMEs actually had any information that warranted being protected because it was confidential, because it was treated as confidential by WIS, or because WIS had taken adequate steps to protect the information. Datascan made this point at the temporary-injunction hearing and continues to do so throughout its brief in several different ways:

- Datascan noted the admission that it had obtained from a WIS executive that he was concerned about what the FMEs carried in their heads and that though he thought it was obvious that the confidential information included what they had obtained by working at WIS, he did not know

whether the FMEs were using that information in their work for Datascan.

- Datascan emphasized that in performing Walmart inventories it was using its own proprietary technology, which it had spent thousands of hours developing. WIS, on the other hand, had its own proprietary technology that was used in its Walmart inventories. Datascan also highlighted what it described as massive efforts of its employees to fine tune the software to meet Walmart's needs.

- Datascan underscored that much of the inventory process was dictated by Walmart's inventory app. Though WIS claimed that it had spent three years assisting Walmart with building the app, WIS also acknowledged that the app was the property of Walmart and was not a part of WIS's confidential information.

- Datascan contended that much of the allegedly confidential information had come to the FMEs before they even began working for WIS.

- Datascan claimed that WIS had allowed the FMEs to acquire what it contended to be confidential information before they were required to sign agreements protecting WIS's allegedly confidential information.

- Though WIS had sent cease-and-desist letters to others that it alleged had obtained its confidential information, Datascan emphasized WIS had not sued those entities.

**6.   We set forth the parties' clash over the propriety of Datascan's actions.**

One fact that was not in dispute was that a number of the FMEs who had recently worked for WIS or affiliated companies were, at the time of the temporary-injunction hearing, working for Datascan or companies that WIS claimed Datascan was using to hide its involvement with the FMEs.  To set the stage for our discussion, we noted above that Datascan had explained that this was a consequence of its seeking employees who had the skills to manage people in the challenging environment of conducting Walmart inventories.  Datascan also emphasized, again, that these employees were trained using its proprietary software that was unique to it and different from that used by WIS.

And, again, WIS's view of Datascan's motives was darker.  In its view,

WIS [had] filed the lawsuit because Datascan [had] entered into a bid with Walmart despite not having the infrastructure from a personnel standpoint to execute it, but . . . upon award of the business, they then had to develop and stand up that infrastructure, and they [had done] so by poaching [WIS's] management employees.

The attribution of innocent or dark motives carried forward into the actions that Datascan took to staff its teams who performed Walmart inventories—with the

14

parties clashing both as to whether the actions occurred and as to what motive should be attributed to them. Without going through each, some examples are as follows:

- Individuals named Ford and Siler worked as Datascan's Director of Inventory Solutions and its Regional Director on its Walmart team, respectively. Both had worked for WIS and RGIS for decades and had been terminated from WIS. Ford had been the Chief Operating Officer of WIS. Their testimony contains the following points that WIS emphasizes:

  - Of the sixteen managers on Datascan's Walmart teams, at one point in time, eleven or twelve of them had been WIS employees.

  - Though Ford testified that Datascan did not view the FMEs' prior agreements as enforceable, he also acknowledged that Datascan knew of the noncompete agreements that the FMEs had signed and considered the consequences of possible actions that WIS might take to enforce them.

  - Siler wrote Ford an email that suggested an optimal situation for Datascan was to fill the management positions on its Walmart teams with people who had detailed knowledge of Walmart's inventory requirements, and that email listed former WIS managers. Ford responded merely "[n]ot necessarily" when

asked, "The reason that hiring WIS employees in management positions on Datascan's Walmart team was optimal was because Datascan was looking for people to fill those roles [who] had detailed knowledge of specific Walmart inventory requirements, right?"

- Datascan allegedly used another company to hire former WIS employees because they had noncompete agreements. Datascan reimbursed the other company for the employees' salaries and did not treat the employees of the other company differently than Datascan employees. Datascan later offered another explanation for why former WIS employees were hired by the other company, such as it had a more liberal drug testing policy.

- Datascan still considered hiring other WIS managers with noncompete agreements after it had received a cease-and-desist letter from WIS's counsel.

WIS presented the testimony of its employees who had been solicited to join Datascan. WIS also presented (1) testimony that a Datascan employee had solicited confidential rate information from a WIS employee and that Snead had solicited and contacted a WIS team member and (2) expert testimony that information had been copied from a WIS laptop. Datascan responded that the employee seeking rate

16

information was fired, that the authenticity of the alleged solicitation by Snead was highly suspicious, and that the expert testimony was so vague that it proved nothing.

To support its position that it had hired WIS's FMEs for their ability to manage people, Datascan described Walmart inventories as "tough," which prompted its need for "people [who] can motivate, manage, support, and help to be able to perform at their best, and that's what we were looking for." Once hired, the FMEs were trained on Datascan's technology, which was a different system than WIS's.

Datascan also contended that it did not disregard the fact that certain of the FMEs had signed noncompete agreements but addressed that situation by having its counsel review the agreements. After that review, Datascan "felt confident that [it] could proceed." Datascan further asserted that it took steps to ensure that the FMEs were instructed not to use WIS's confidential information. Datascan also attacked what it couched as WIS's newly found concerns about what it contended is its confidential information and asserted that WIS had done a poor job of protecting the information that it now contends is confidential. In sum, it is Datascan's view that WIS is not acting to protect its secrets but has launched an attack strategically timed to disrupt Datascan's ability to compete for the work that it fairly won from Walmart and which it is performing with the capabilities that it developed rather than with any information it allegedly pirated from WIS.

**B.    Procedural background**

WIS filed "Plaintiff's Verified Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunction" naming Datascan and Snead as defendants.  We will not attempt to outline the factual allegations of the petition, which spans more than sixty pages.  The petition alleged the following causes of action:  (1) breach of contract for breach of nondisclosure against Snead; (2) breach of contract for breach of nonsolicitation against Snead; (3) breach of contract for breach of noncompete against Snead; (4) breach of fiduciary duty against Snead; (5) tortious interference with the FMEs' agreements by Datascan; (6) tortious interference with WIS's contract with Walmart by Datascan; (7) knowing participation in breach of fiduciary duty by Datascan; (8) unfair competition by misappropriation by Datascan; and (9) an application for temporary and permanent injunctive relief.

The trial court entered an original and an amended temporary restraining order, which was subsequently extended.  The trial court conducted a temporary-injunction hearing that spanned a day and a half.  At the conclusion of the hearing, the trial court indicated that it would grant a temporary injunction.

The trial court then signed a temporary-injunction order, which included six pages of findings that covered the following:

- WIS and Datascan had a competitive relationship;

- The FMEs hired by Datascan directly or through other companies were working with Datascan to compete against WIS;

- The FMEs were mostly bound by confidentiality, noncompete, and nonsolicitation agreements;

- WIS had provided the FMEs with confidential information (the nature of which was described in the findings);

- The executed agreements bound the FMEs not to disclose confidential information and prohibited them for one year following the end of the FMEs' employment with WIS from competing with or soliciting WIS employees to leave;

- Snead and the other former FMEs "are employed in positions that are substantially similar to the[] capacities [that they] held when employed at WIS[,] and they have similar duties and responsibilities to those previously performed while they were working at WIS";

- "Snead has solicited WIS employees to join Datascan and/or another competitor to induce those WIS employees to end their employment with WIS";

- Other former FMEs have solicited WIS employees to leave their employment with WIS and "have disclosed or used, or it is highly

probable that they will disclose or use, WIS Confidential Information while working for Datascan and in competition with WIS";

- The former FMEs breached the "confidentiality, noncompetition, and/or non[]solicitation provisions in their respective [c]onfidentiality [a]greements";

- "Datascan knew that each of the [FMEs] had employment agreements with WIS containing confidentiality, non[]solicitation and noncompetition obligations[;] Datascan devised a scheme to cause the [FMEs] to breach those agreements and assisted the [FMEs] to conceal their breaches from WIS[; and] Datascan further participated in the [FMEs] nonsolicitation obligations owed to WIS"; and

- WIS has a probable right to recovery and would suffer imminent and irreplaceable harm if injunctive relief were not granted.

Datascan uses the attacks that we have outlined above to challenge many of the findings in the injunction order and argues that the findings demonstrate an abuse of discretion in the trial court's decision to grant a temporary injunction.

The injunction order also imposed eleven restraints. We will describe those restraints in more detail when we address Datascan's challenges to both the breadth and the lack of specificity of a number of the restraints.

After the trial court signed the injunction order, Snead and Datascan jointly filed a notice of appeal.

## III. Analysis

### A. We set forth the standard of review that applies when reviewing a temporary-injunction order.

In an interlocutory appeal involving issues similar to the ones at issue in this appeal, we outlined the standards that govern our review as follows:

> "A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916 (Tex. 2020) (quoting *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). Such an injunction functions "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g) (citing *Walling*, 863 S.W.2d at 57). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*

> The trial court exercises its sound discretion in deciding whether to issue a temporary injunction, and we may reverse that decision only if we conclude that the trial court abused its discretion because its actions were "so arbitrary that [they] exceeded the bounds of reasonable discretion." *Id.* Our abuse-of-discretion review requires that we "view the evidence in the light most favorable to the trial court's order [and that we indulge] every reasonable inference in its favor." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 196 (Tex. App.—Fort Worth 2005, no pet.). Thus, if the trial court must resolve a conflict in the evidence, its resolution of a fact issue is one to which we must defer. *Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 292 (Tex. App.—Beaumont 2004, no pet.). However, we review the trial court's application of the law to established facts and the resolution of pure legal questions de novo. *Jelinis, LLC v. Hiran*, 557 S.W.3d 159, 165 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) . . . ; *Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 883 (Tex. App.—Dallas 2003, no pet.).

21

Also, "[w]hen the trial court embeds findings of fact and conclusions of law in its order denying a temporary injunction, the findings and conclusions may be helpful in determining whether the trial court exercised its discretion in a principled fashion[;] however, they are not binding on this court." *Communicon, Ltd. v. Guy Brown Fire & Safety, Inc.*, No. 02-17-00330-CV, 2018 WL 1414837, at *6 (Tex. App.—Fort Worth Mar. 22, 2018, no pet.) (mem. op.).

Because the temporary injunction only preserves the status quo pending final trial, the trial court's determination regarding whether to issue the temporary injunction does not resolve the ultimate merits of the suit. *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979). The assumption is that the evidence may well change between the preliminary temporary-injunction stage of the proceeding and a final trial on the merits. *Burgess v. Denton C[n]ty.*, 359 S.W.3d 351, 359 n.35 (Tex. App.—Fort Worth 2012, no pet.) (citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978)). Thus, the probability-of-success requirement does not require an applicant to show that it will prevail at final trial. [*Young Gi*] *Kim v.* [*Ick Soo*] *Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.). The requirement goes no further than necessitating that "the applicant [ ] present enough evidence to raise a *bona fide* issue as to its right to ultimate relief." *Id.*

*Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *5–6

(Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.).

**B.  Datascan asserts that the trial court abused its discretion by awarding temporary-injunctive relief because the restrictive covenants that WIS relies on are unenforceable.**

In its first issue, Datascan launches a host of attacks on the enforceability of the covenants contained in various agreements signed by the FMEs, including overbreadth, lack of consideration, the failure to execute, and the failure to modify the agreements to make WIS a party to them. For the most part and based on the liberal

22

standard that applies to the review of a temporary-injunction order, we overrule the contentions.

> **1.  In the temporary-injunction context, the trial court did not abuse its discretion by failing to conclude that the covenants at issue were unenforceable because they lacked a reasonable limitation on their scope of activity.  However, because this case is being remanded, we instruct the trial court to determine whether the scope of activity should be modified in an amended temporary-injunction order.**

In the first subissue under its first issue, Datascan challenges the restrictive covenants in the various FMEs' agreements by claiming that they lack reasonable limitations on the scope of activity.  Specifically, it argues that covenants "imposing industry-wide exclusions from subsequent employment are *per se* unreasonable."  In Datascan's view, the language in the covenants that prohibits the FMEs from "engag[ing] in any business activity or work that is in any way competitive with any Business of" its former employers creates a prohibited industry-wide exclusion.

Datascan then argues that the impermissible breadth of the covenants is compounded by their broad definitions of "business":

> The definitions of the applicable "Business of WIS" and "Business of RGIS" are likewise improperly overbroad and seek to cover not only a collection of multiple entire industries[] but [also] every type of business that could be considered "supportive or incidental to" such industries. These terms are defined to include "any business that [employer] engages in at any time during the Employment Period, including, without limitation, the provision of temporary help, merchandising, mapping[,] or inventory services to the retail, wholesale, commercial[,] and supply[-]chain industries, and any other business engaged in by [employer] during the Employment Period, and all activities supportive of and incidental to such services or other businesses."

23

In essence, both Datascan's and WIS's briefs address the breadth of the restraints in a fashion that seeks our ruling either condemning or blessing the scope-of-activity restriction in the covenants. But in the context of a temporary injunction, a ruling on the merits for either party at this preliminary stage of the case is premature. However, because we will remand this case to the trial court to address defects in the form of the injunction order,[7] we will instruct the trial court to determine whether the scope of activity subject to its injunction order should be narrowed.

With respect to why review of the reasonableness of the scope of activity is premature, we begin by noting that the restraints in a covenant are enforceable "to the extent that [they] contain[] limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise." Tex. Bus. & Com. Code Ann. § 15.50(a). Datascan supports its view that the covenants are unreasonably overbroad by citing authority holding that "[u]nder Texas law, covenants not to compete that 'extend[ ] to clients with whom the employee had no dealings during [her] employment' or [that] amount to industry-wide exclusions are 'overbroad and unreasonable.'" *D'onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 211 (5th Cir. 2018). WIS cites authority that it asserts validates the view that the covenants are not overbroad. *See Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d

---

[7] *See* our discussion of Datascan's third issue *infra* Section III.D.

585, 599 (E.D. Tex. 2021) (upholding covenant that prohibited employee from "work[ing] or consult[ing] for or otherwise affiliat[ing] hisself [sic]/herself with any business in competition with or otherwise similar to [employer]'s"), *aff'd sub nom. Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023) (per curiam) (not designated for publication); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 568 (S.D. Tex. 2014) (findings of fact, conclusions of law, and order on hearing for preliminary injunction) (holding that agreement that restricted defendant from performing for competitors the same kind of work performed for former employer was reasonable).[8]

But as we have noted previously, the ultimate resolution of whether a covenant not to compete is reasonable is beyond the scope of our review in an appeal from a temporary injunction:

> As we noted when describing the standard of review, the ultimate merits of a suit are not before the trial court when deciding whether to issue a temporary injunction. Thus, when we review the propriety of a temporary injunction, we do not resolve the ultimate question of whether a covenant is legally enforceable under the provisions of Texas Business and Commerce Code Section 15.50, which governs those covenants. *See Henry F. Coffeen III Mgmt., Inc. v. Musgrave*, No. 02-16-00070-CV, 2016 WL 6277375, at *2 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.).
>
> Rather, in the context of a temporary injunction involving a noncompete covenant, we review the enforceability issue "only to the

---

[8]Throughout its argument, Datascan refers to the findings that were made in the injunction order. As we noted in *Hernandez*, we may consider the findings of fact and conclusions of law embedded in a temporary-injunction order, but they do not bind us. 2021 WL 520456, at *6.

extent necessary to determine whether the requirements for a temporary injunction have been met." *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *3 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.); *see also Vaughn v. Intrepid Directional Drilling Specialists, Ltd.*, 288 S.W.3d 931, 938 (Tex. App.—Eastland 2009, no pet.) ("[B]y granting a temporary injunction, a trial court does not declare that a covenant not to compete is valid."); *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (stating that an appeal of an order granting or denying a temporary injunction based on a noncompete covenant does not present for appellate review the ultimate question of whether the covenant is enforceable under the Covenant Not to Compete Act); *Tom James of Dall*[.], 109 S.W.3d at 882–83.

*Hernandez*, 2021 WL 520456, at *7; *see also Thomas v. A*Med Mgmt., Inc.*, No. 01-19-00564-CV, 2020 WL 5269412, at *8 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.) (stating same standard as *Hernandez*—that the question of the validity of a covenant not to compete is deferred until resolution on the merits). We adhere to our holding in *Hernandez* that whether a covenant is reasonable should await the ultimate resolution on the merits.

In *Hernandez*, we noted that even though the question of the reasonableness of a covenant is a question for a later date than the review of a temporary injunction, we cannot simply ignore the impact of Section 15.50. 2021 WL 520456, at *7–8. We cited—as does Datascan—*LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In *LasikPlus*, our sister court held that it was not error for the trial court to consider the impact of Section 15.50 in deciding to deny a temporary injunction. *Id.* at 217–18. But *LasikPlus* involved a question regarding whether a hard-and-fast prerequisite to enforceability of a covenant was

26

present—the requirement found in Section 15.50(b)(2) that a covenant binding a physician must contain a buyout provision. *Id.* Here, the issue is not whether a precondition to enforceability of a covenant is present but whether the covenant is reasonable. The weight of authority cited in *Hernandez* shows that the question of whether a covenant is reasonable is one for a later date so that it can be determined with a more complete record than would be available in an appeal from the granting of a temporary injunction. 2021 WL 520456, at *7.

Also, Datascan does not argue that the covenant would still be unreasonable if it restricted a narrower scope of activity, i.e., if the FMEs were prohibited from servicing only customers they serviced while at WIS. Even if the covenant in its present form is too broad, it could be reformed and enforced by injunction. *See* Tex. Bus. & Com. Code Ann. § 15.51.[9]

_____

[9]The text of Section 15.51(c) provides,

If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief. If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render

27

We have previously held that if a trial court concludes that a covenant is too broad, it can narrow the breadth and then issue a temporary-injunction order restraining violations of the reformed covenant. We set out our reasoning regarding why a narrowed and reformed covenant could be the basis for a temporary injunction in *Tranter*, 2014 WL 1257278, at *6. As we explained in *Tranter*,

> Because the noncompetition clause may be reformed, the lack of geographic restriction is not necessarily fatal to [appellant's] ability to demonstrate a probable right to permanent injunctive relief. *See Butnaru*, 84 S.W.3d at 204. Similarly, if the limitations as to time and scope of activity were likewise unreasonable, the trial court could reform the limitations and enforce the reformed covenant through injunctive relief. *See* Tex. Bus. & Com. Code Ann. § 15.51(c) ("[T]he court shall reform the covenant to the extent necessary . . . and enforce the covenant as reformed.").
>
> Under the common law, a party seeking an injunction must show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy. *Tom James Co. v. Mendrop*, 819 S.W.2d 251, 252 (Tex. App.—Fort Worth 1991, no writ). However, if a party relies on a statute that defines the requirements for injunctive relief, then the express statutory language supersedes common law requirements. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 795 (Tex. App.—Houston

---

> personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

Tex. Bus. & Com. Code Ann. § 15.51(c).

[1st Dist.] 2001, no pet.). Our sister courts have held that the Covenants Not to Compete Act preempt[s] the common law requirements for permanent injunctive relief. *See Primary Health Physicians, P.A. v. Sarver*, 390 S.W.3d 662, 665 (Tex. App.—Dallas 2012, no pet.); *EMSL Analytical*, 154 S.W.3d at 695; *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 239 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Butler*, 51 S.W.3d at 795. We agree. The Act has no requirement for a showing of irreparable injury; thus, irreparable injury for which there is no adequate legal remedy is not a prerequisite to permanent injunctive relief. Tex. Bus. & Com. Code Ann. § 15.51(a) (providing for "damages, injunctive relief, or both" for a breach of a noncompete by the promisor); *see also id.* § 15.52 (stating that "the procedures and remedies . . . provided by Section 15.51 . . . are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise").

. . . .

Therefore, because [appellant] provided evidence that the noncompete at issue is ancillary to or part of an otherwise enforceable agreement and because the noncompete can be reformed to contain reasonable limitations as to time, geographic area, and scope of activity that do not impose a greater restraint than is necessary, [appellant] established a probable right to recovery on its permanent[-]injunction claim. *See* Tex. Bus. & Com. Code Ann. § 15.50(a); *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-00364-CV, 2008 WL 1747624, at *9 (Tex. App.—Corpus Christi[–Edinburg] Apr[.] 17, 2008, no pet.) (mem. op.) (holding that employer established its probable right to relief regarding the noncompete by showing that the noncompete was ancillary to an otherwise enforceable agreement).

*Id.* at *6–7 (footnote omitted); *see also Insight Direct USA, Inc. v. Kelleher*, No. 1:17-CV-252-RP, 2017 WL 1371252, at *2 (W.D. Tex. Apr. 10, 2017) (order) ("Indeed, Texas courts have repeatedly reformed non[]compete covenants at the temporary[-]restraining order or preliminary[-]injunction stage."); *McKissock, LLC v.*

29

*Martin*, 267 F. Supp. 3d 841, 860 (W.D. Tex. 2016) (order) (reforming a noncompete covenant while granting a preliminary injunction).

In its petition, as the plaintiff did in *Tranter*, WIS sought a permanent injunction to restrain Datascan and Snead. And indeed, Datascan argued to the trial court that the covenants should be reformed. Datascan carries that argument forward into its brief, contending in footnote 24 that "if the [c]ourt determines that the [a]greements are otherwise enforceable and that only the [r]estrictive [c]ovenants should be reformed, the [t]emporary [i]njunction should be dissolved and the issue should be remanded to the [t]rial [c]ourt."

As noted, we are remanding this case. This will give the trial court the opportunity to consider whether reformation is necessary in light of Datascan's argument that the restraint on the scope of activity in the covenants is unreasonably broad.

We overrule Datascan's first subissue under its first issue, but we instruct the trial court to determine on remand whether its injunction order should be modified to reduce the scope of activity that it currently embraces.

>    **2.    The trial court did not abuse its discretion by failing to conclude that the covenants at issue were unenforceable because they lacked a reasonable limitation on their geographic scope**.

In the second subissue under its first issue, Datascan argues that the covenants are unreasonable because their geographic scope is unreasonably broad as follows:

30

> The WIS and RGIS [r]estrictive [c]ovenants purport to "include anywhere in the United States of America and its territories and possessions." . . . By contrast, the record establishes that the work performed by these employees while employed by WIS and/or RGIS was necessarily limited to discrete geographic regions. . . . Indeed, even their job titles reflect the limited geographic scope of their work (e.g., *Area*, *District*, or *Regional* Managers). Moreover, these FMEs largely worked for the single client of Walmart in their distinct markets, further making an industrywide ban across the entire United States unreasonable.

Again, for the same reasons stated above, it is premature to review this question. Beyond that, the record contains evidence that the FMEs moved from region to region to perform inventory services and that inventory work for Walmart was performed in the same way no matter in which district it was performed. This is some evidence that permitted the trial court to conclude that—at this preliminary stage of the litigation—the geographic scope of the covenants was reasonable.[10]

We will not rehash our prior discussion of our holding in *Hernandez* and the holdings of other cases that the issue of the reasonableness of the covenant is premature in the review of a temporary-injunction order.

But even if we were to address the issue, we disagree that the trial court abused its discretion by rejecting Datascan's argument—in the context of a temporary

---

[10]Datascan notes that the RGIS agreements state that they shall "be governed by and construed under the laws of the State of Michigan." In Datascan's brief, though it cites Michigan law, it suggests that Michigan law parallels Texas law. As a general proposition, absent proof that Michigan law differs from Texas law, we presume the laws of the two states are the same. *See Touponse v. Touponse*, No. 02-20-00285-CV, 2021 WL 2753504, at *4 (Tex. App.—Fort Worth July 1, 2021, no pet.) (mem. op.). Based on Datascan's representation, we assume that Michigan law would yield the same analysis as Texas law.

injunction—that the covenants had an unreasonably broad geographic sweep. To support its argument, Datascan cites authority that states the proposition that "[g]enerally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." *See Butler*, 51 S.W.3d at 793. That general rule, however, is not inflexible. For example, WIS cites authority that recognizes there may be justifications for a geographic restriction broader than simply the area where an employee previously worked:

> [C]ourts will uphold a national or global covenant whose scope exceeds an employee's territory when the scope is justified by the business interest underlying the covenant. *See, e.g., Daily Instruments Corp. . . .* , 998 F. Supp. 2d [at] 567–68 . . . (upholding a covenant extending to every country in which the employer did business where the global customer base was "very narrow" and the high-level employee had access to confidential information about customers and projects outside his territory).

*Accruent, LLC v. Short*, No. 1:17-CV-858-RP, 2018 WL 297614, at *4 (W.D. Tex. Jan. 4, 2018) (order).

WIS offers a justification for the nationwide geographic restriction by highlighting how the FMEs moved from district to district:

> Here, WIS presented evidence that it conducts inventory services all over the country, and the FMEs received extensive confidential information, making them a valuable asset to a competitor anywhere WIS operates—regardless of where the employee was based. . . . The reasonableness of the nationwide restrictive covenants is especially evident given that Datascan recruited WIS management employees to move across the country to perform the same inventory[-]services work

they performed for WIS for the same nationwide customers[,] such as Walmart.

Applying our deferential standard of review in the temporary-injunction context, this is some evidence that supports the trial court's discretion in concluding that WIS had a probable right to recovery even though the covenants had a broad geographic sweep.

And not only is there evidence that the FMEs moved from district to district, but also the nature of the Walmart inventory process supports the conclusion that the trial court did not abuse its discretion. Apparently, how a Walmart inventory is performed does not vary from district to district. The crew field manual that was introduced by WIS set procedures for a Walmart inventory—no matter where it was performed. Indeed, evidence from witnesses who testified on both sides confirmed the standardized nature of a Walmart inventory and the duties of those who managed the audits. A witness who testified on behalf of WIS described the duties of a district manager and noted that the duties did not vary depending on what part of the country the district manager was in. This witness also testified that there was no difference between working on the Walmart team in one state and working on a Walmart team in another state. One of the FMEs testified that he had moved from a territory in Pennsylvania to one in Florida. Though he received training on Datascan's software, he received no training "on Walmart" because he already knew it. Again, this is some evidence that WIS's business interests warranted a broader protection than simply

restricting former employees from working in the area where they had been employed by WIS.

We overrule Datascan's second subissue under its first issue.

### 3. The trial court did not abuse its discretion by failing to conclude that the WIS agreements were not supported by consideration.

As noted above, certain of the FMEs were required to sign agreements with WIS after they were already employed by it. Datascan argues in its third subissue under its first issue that the agreements were not supported by consideration and thus are void. WIS responds that consideration exists when an employee is provided confidential information after execution of an agreement. The record in this appeal contains evidence that WIS withheld certain confidential information until after the complained-of employees signed the WIS agreement. As we have set forth above, we operate under a highly deferential standard of review when reviewing the grant of a temporary injunction. Under this standard, there is some evidence of consideration.

The Tyler Court of Appeals has provided a comprehensive description of when the question of consideration may be a legal or factual question and how the question of consideration impacts the enforceability of a covenant not to compete:

> The enforceability of a covenant[-]not[-]to[-]compete agreement is a question of law. *Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 696 (Tex. App.—Dallas 2008, no pet.); *see also Gorman v. CCS Midstream Servs., L.L.C.*, No. 12-09-00204-CV, 2011 WL 1642624, at *3 (Tex. App.— Tyler 2011, no pet.) (mem. op.). Likewise, what constitutes sufficient consideration for a contract is generally a question of law[] but can be a question of fact. *Roark v. Stallworth Oil [&] Gas, Inc.*, 813 S.W.2d 492,

34

496 (Tex. 1991) (holding factual questions remained on consideration issue in summary[-]judgment case due to failure to produce conclusive proof); *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) (question of law).

A covenant not to compete is enforceable if it is (1) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) reasonable, not imposing a greater restraint than is necessary to protect the goodwill or other business interest of the employer. *See* Tex. Bus. & Com. Code Ann. § 15.50(a) . . . . The first element can be broken down into two inquiries: (1) whether there is an "otherwise enforceable agreement," and (2) whether the covenant not to compete is "ancillary to or part of" that agreement at the time the otherwise enforceable agreement was made. *See Mann Frankfort*[ *Stein & Lipp Advisors, Inc. v. Fielding*], 289 S.W.3d [844,] 849[ (Tex. 2009)].

With regard to the first inquiry, "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory. *Id.* Moreover, a unilateral contract formed when an employer performs a promise that was illusory when the contract was formed can satisfy the requirements of the statute. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). Thus, when an employer makes an illusory promise of consideration and[] later[] performs in accord with the promise, the consideration is no longer illusory. *See id.* Additionally, even in the absence of an express promise to provide confidential information, when the nature of the employee's work requires confidential information to be provided for him to perform the work, the employer impliedly promises the information will be provided. *See Mann Frankfort*, 289 S.W.3d at 850.

Concerning the second inquiry, for a covenant not to compete to be "ancillary to or part of" an otherwise enforceable agreement, the employer must establish both that (a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011) [(op. on reh'g)]. "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." *Sheshunoff*, 209 S.W.3d at 651. The consideration from the employer "must give rise to

the employer's interest in restraining the employee from competing." *Id.* at 648–49. Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete. *See, e.g., Marsh USA Inc.,* 354 S.W.3d at 777; *Sheshunoff,* 209 S.W.3d at 651; *Neurodiagnostic Tex, L.L.C. v. Pierce,* 506 S.W.3d 153, 163–64 (Tex. App.—Tyler 2016, no pet.) [(op. on reh'g)].

*PetroChoice Holdings, LLC v. Pearce,* No. 12-20-00106-CV, 2021 WL 126591, at *3–4 (Tex. App.—Tyler 2021, no pet.) (mem. op.). Further, we have held that "[t]he consideration requirement was satisfied by [the employer's] performance in disclosing its confidential information to [the employee] in exchange for [the employee's] promise to keep that information confidential." *Tranter,* 2014 WL 1257278, at *5.

Each of the WIS agreements provided that "[*i*]*n consideration of employment, continued employment, or promotion (as applicable) and disclosure of the Confidential Information (as defined below) by the Company to Employee, WIS and Employee have agreed as follows*[.]" Except for one of the FMEs who signed the WIS agreements, the agreements were signed by the FMEs in June 2022. WIS offered testimony that it had ceased providing certain financial information to District Managers in May 2021 while it integrated its financial systems, presumably after the acquisition of RGIS. The integrated financial information was not released until July 2022. WIS Executive Vice President of National Accounts explained how the release of the integrated financial information coincided with the execution of the WIS agreements as follows:

36

Q. (By [WIS's counsel]) . . . [W]e've seen several of these agreements -- and Ms. Large [(one of the FMEs)] is an example -- that were signed in and around June of 2022, is that right?

A. Yes.

Q. Can you tell the [c]ourt why these agreements were signed in or around June of 2022?

A. There's two pieces to that. The first piece was since the integration -- or the acquisition in May of 2021, we stopped producing or creating financial statements down at the office level until we got further along into the integration and felt comfortable with, throughout the integration process, which management teams we'd be keeping and in what roles they would be functioning in.

In July of 2022, we were prepared to release these financial report[s] by individual office to these managers. Before that information was distributed, I wanted to be sure [of] two things. One, as part of that rollout, we had valid noncompetes and confidentiality agreements signed by everybody in place. And then, two, we needed to have those for the integration anyway. So I asked HR to . . . make that an undertaking.[11]

One FME refused to sign the WIS agreement, but that FME had been an employee of RGIS and had what WIS considered a valid noncompete/confidentiality agreement on file, i.e., an agreement executed between the employee and RGIS.

Datascan's attack on the consideration issue is narrow: "Here, the WIS [a]greements were not accompanied by consideration. WIS [a]greements were entered into *after* FMEs were employed as managers and *after* they were provided WIS Confidential Information. There is no evidence that WIS [a]greements were signed in connection with promotions, raises, or other changes to employment." [Briefing

---

[11]Two FMEs who signed the agreements in June 2022 were District Managers, and one was a Regional Manager.

37

reference omitted.] Datascan does not challenge the principle that the provision of additional confidential information may serve as consideration but claims "upon inspection, WIS's citations to the record do not support that WIS Confidential Information was shared with FMEs." Yet Datascan does not explain why the evidence that we have quoted does not create a question of fact regarding whether consideration was provided and would not be sufficient—in the highly deferential setting in which we review the trial court's injunction order—to support the exercise of the court's discretion to decide at this preliminary point in the litigation that the WIS agreements were supported by consideration.

Because we hold that the evidence supports the trial court's decision, we overrule Datascan's third subissue under its first issue.

### 4. The trial court did not abuse its discretion by failing to conclude that the WIS agreements "do not protect an interest worthy of protection."

Datascan argues in the fifth subissue under its first issue that the trial court should have inferred that the noncompete agreements that WIS seeks to enforce do not protect an interest worthy of protection because WIS did not sue another company that hired an FME. Datascan asks us to overturn the injunction because the trial court did not draw the inference that Datascan prefers. Again, to do so would transgress the deference that we must show in reviewing the trial court's decision to grant a temporary injunction.

Rather than try to summarize Datascan's argument, we quote the one paragraph from its opening brief that contains the entirety of the argument:

> Here, WIS's actions related to Large—who went to work for OSL, another competitor of WIS—establish[] that the information WIS sought to protect through the WIS [a]greements is not an interest worthy of protection. Specifically, WIS is well-aware that Large is working for OSL[,] but WIS has not sought to protect the information that Large purportedly has (which is the same purported confidential information that each of the FMEs who work for Datascan allegedly ha[s]). WIS has thus permitted the confidential information it seeks to protect here to be shared with a different competitor. As a result, the information is not an interest worthy of protection and thus cannot form the basis for consideration of the WIS [r]estrictive [c]ovenants. *See Wharton* [*Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV], 2016 WL 192069, at *4 [(Tex. App.—Corpus Christi–Edinburg Jan. 14, 2016, no pet.) (mem. op.)] (finding that employer failed to establish interest worthy of protection necessary for non[]compete when the knowledge sought to be protected could be shared with a competing corporation). Accordingly, the WIS [r]estrictive [c]ovenants are unenforceable. [Footnote and record reference omitted.]

Datascan's reply brief explains the inference that it thought the trial court should have drawn from WIS's inaction:

> WIS contends that it acted diligently with respect to [Snead's husband] and Large when they went to work for competitors PICS and OSL, respectively, by sending cease-and-desist letters. *But the fact remains that it did not sue and showed no urgency in pursuing its alleged rights until it saw an opportunity to bring this litigation against Datascan, its competitor who won part of Walmart's work through a fair RFP process months before it hired any FMEs. Coupled with the fact that the noncompete [a]greements were sprung on FMEs in the midst of an RFP process for Walmart and only after WIS realized that it may lose Walmart work, and [the WIS executive's] concession that WIS cares only about information in the heads of FMEs, it becomes clear that WIS's chief concern was losing business—not confidential information—to competitors.* [Brief and record references omitted.] [Emphasis added.]

As signaled by the quote from Datascan's reply brief, WIS notes that it sent a cease-and-desist letter to both OSL and Large. It also argues that it pleaded and presented evidence that Datascan and OSL were working jointly to tortiously interfere with the FMEs' agreements.

In essence, Datascan's argument is that although WIS has taken actions to challenge OSL's and Large's use of WIS's confidential information, it must be inferred that the failure to sue OSL or Large demonstrates that WIS does not truly consider its information to be confidential. Datascan argues that this inference is required even though other reasons may justify WIS's not taking the next step of suing OSL. Datascan also ignores an opposite inference that can be drawn from WIS's suit against it: WIS believes that the information is confidential and is willing to expend time and attorney's fees to protect it. Based on the thin record produced at the temporary-injunction hearing and the multiple conflicting inferences that can be drawn from that record, we will not hold that the trial court was bound to pick only the one that supports Datascan's position out of the range of possible conclusions that could be drawn from the temporary-injunction record or that may be drawn when a full record is developed.

Nor does the authority that Datascan cites support its argument. That authority holds that information is not worthy of protection unless it "'could not readily be identified by someone outside [the employer's] employ, . . . carried some competitive advantage,' or . . . outside of the six-month period required under the

40

non-compete clause, . . . could not be shared with a competing corporation." *Wharton Physician Servs.*, 2016 WL 192069, at \*4. Further, in *Wharton*, "the non[]compete clause was not accompanied by any provision requesting non[]disclosure of this 'confidential and proprietary information.'" *Id.* WIS certainly argues that the information could not be readily identified by a third party and relies on agreements that prohibit the disclosure of confidential information. How *Wharton*'s holding supports Datascan's present argument is unclear.

Because the trial court did not abuse its discretion by inferring that the WIS agreements insulate an interest worthy of protection, we overrule Datascan's fifth subissue.

### 5. The trial court did not abuse its discretion by failing to conclude that the WIS agreements were invalid because they were not executed by WIS.

The WIS agreements introduced into evidence were not executed by WIS, and WIS offered no evidence that copies existed that it had signed. Datascan argues in its fourth subissue under its first issue that WIS's failure to sign the agreements renders them invalid primarily because of a provision in the agreements that indicates that without execution, the agreements are not binding. The argument assumes that without both parties' signature there is no agreement, but that argument ignores that the provision states that a party who signs is bound.

The WIS agreements each contain the following provision: "Authority to Execute: *Each party warrants and represents to the other party that this [a]greement will be*

41

*binding upon it once executed*, and that the individual executing this document is authorized or has been empowered to do so." [Emphasis added.] Datascan's argument turns on its interpretation of this phrase as creating a condition precedent that both parties must sign the agreement before it is binding. WIS responds with an argument that "the [a]greements contain no language explicitly or unambiguously requiring signatures as a condition of mutual assent." WIS then argues that its conduct manifested its assent to the agreements, specifically through its conduct of continuing to employ the FMEs who had signed the agreement and the sharing of confidential information with them.

As a starting point,

[C]ontracts require mutual assent, which, in the case of a written contract, is generally evidenced by the signatures of the parties and delivery with the intent to bind. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007). "But while signature and delivery are often evidence of the mutual assent required for a contract, they are not essential." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 277 (Tex. 2015).

*McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 522 (Tex. App.—El Paso 2020, no pet.).

In addressing this question that Datascan raises, we will follow the analytical framework set forth by the El Paso Court of Appeals:

- "[T]he absence of a party's signature does not necessarily destroy an otherwise valid contract and is not dispositive of the question of whether the parties intended to be bound by the terms of a contract."

42

- "[W]hen the terms of the contract make it clear that a signature is required, a party's failure to sign the agreement will render the agreement unenforceable."

- "Conversely, when there is no evidence in the record to suggest that the parties intended for a signature to be a condition precedent to the signing of an agreement, then a party's failure to sign the agreement does not render the agreement unenforceable, as long as it appears that the parties otherwise gave their consent to the terms of the agreement."

- "[A] parties' [sic] intent to be bound by a contract may be evidenced by its conduct at the time a contract is drafted and by its subsequent conduct reflecting that it was acting in accordance with the terms of the contract."

*Id.* at 522–23 (quoting *Wright v. Hernandez*, 469 S.W.3d 744, 757–58, 760 (Tex. App.—El Paso 2015, no pet.)).

In its argument, Datascan does not challenge the principles that the absence of a signature does not necessarily destroy the existence of a contract and that conduct may bind a party to the contract. Instead, its argument focuses on the execution provision that we quoted as a clear indication that WIS's signature is required as a condition precedent to the contract's formation. The El Paso Court of Appeals has previously cataloged a number of cases that interpreted a signature provision as creating a condition precedent to the existence of a contract:

[W]hen the terms of the contract make it clear that a signature is required, a party's failure to sign the agreement will render the agreement unenforceable. *See Simmons & Simmons Constr. Co. v. Rea*, . . . 286 S.W.2d 415, 418–19 ([Tex.] 1955) (the evidence did not support a jury's verdict enforcing a contract where one of the parties had not signed the agreement, the contract contained a signature block; the contract itself

43

stated that the parties' signatures had to be notarized, and the contract was given to one of the part[ies] with directions to sign it and return to the other party for signing); *Lujan v. Alorica*, 445 S.W.3d 443, 448–49 (Tex. App.—El Paso 2014, no pet.) (when a contract expressly requires a signature prior to it[s] becoming binding, the existence of the instrument is destroyed by the other party's failure to sign the instrument); *W. Tex*[.] *Hosp*[.]*, Inc. v. Enercon Int'l, Inc.*, No. 07-09-0213-CV, 2010 WL 3417845, at *5 (Tex. App.—Amarillo Aug. 31, 2010, no pet.) [(mem. op.)] (agreement expressly required the signature of both parties and stated that it would be "binding upon all parties the date [appellee] dates and signs the duplicate originals, which date shall be the 'execution date of Agreement.'").

*Wright*, 469 S.W.3d at 758.

The execution provision in the WIS agreements presents us with a quandary: what is the effect of a provision that states it is binding once executed? The operative phrase provides that "[e]ach party warrants and represents to the other party that this [a]greement will be binding upon it once executed." Does that mean both parties must execute it before it binds both? Does it mean that once a party signs, in this case the FMEs, the parties are bound? Is the provision so clear that once a party indicates its assent to the agreement by signing it, the other party cannot show its assent by performance?

Again, we are at a preliminary stage of this proceeding in our review of the injunction. When faced with an ambiguous document, the trial court is presented with a bona fide dispute that permits it to exercise its discretion with respect to the issuance of a temporary injunction. *Vaughn*, 288 S.W.3d at 938 (holding that due to a disagreement about the construction of a document, the trial court did not abuse its

discretion by granting a temporary injunction); *City of Houston v. Todd*, 41 S.W.3d 289, 302–03 (Tex. App.—Houston [1st Dist.] 2001, pets. denied) (Brister, J., dissenting on reh'g) (stating that "[w]hen the issuance of a temporary injunction turns on provisions that must be construed rather than on clear language, a trial court does not abuse its discretion in either granting or denying the relief" and noting that "[a] substantial difference of opinion as to the proper construction of documents is alone sufficient to justify a temporary injunction"); *183/620 Grp. Joint Venture v. SPF Joint Venture*, 765 S.W.2d 901, 904 (Tex. App.—Austin 1989, writ dism'd w.o.j.) (holding that when a bona fide dispute existed as to the construction of contract documents, the trial court reasonably concluded that a party had shown a probable right of recovery). Accordingly, the trial court did not abuse its discretion by issuing the injunction despite the absence of WIS's signatures from the WIS agreements.

We overrule Datascan's fourth subissue under its first issue.

### 6. The trial court did not abuse its discretion by failing to conclude that agreements executed between certain FMEs and RGIS could not be a basis for WIS's tortious-interference claim.

As noted above, certain FMEs did not execute agreements with WIS but had executed agreements with RGIS before it was acquired by WIS. Datascan argues in the sixth subissue under its first issue that we should reject WIS's claim that the RGIS agreements had provisions that transferred their protections to WIS as a result of the acquisition. Specifically, Datascan argues that the protections of the agreements could

45

not pass to WIS unless the agreements were explicitly modified to transfer the protections to WIS and that modification did not occur. Based on the provisions of the RGIS agreements providing protection to RGIS's successors, we conclude that the trial court did not abuse its discretion by concluding that they supported a probable right to recovery by WIS.

Datascan highlights that three of the FMEs never signed an agreement containing a restrictive covenant or a confidentiality agreement with WIS. Instead, the only agreement that they had signed was between themselves and RGIS.

WIS does not dispute that the FMEs in question entered into no agreement with WIS. Instead, WIS highlights provisions in the RGIS agreement that it argues gave it the benefit of the agreements. Specifically, WIS notes that two paragraphs of the RGIS agreement provide as follows:

> 10. Assignability. This Agreement is personal to Employee[] and may not be assigned or delegated to any other party by Employee. This Agreement may and shall be assigned or transferred to any successor of RGIS, and any such successor shall be deemed substituted for all purposes of RGIS under the terms of this Agreement. As used in this Agreement, the term "successor" shall mean any person, firm, corporation[,] or business entity [that] at any time, whether by merger, purchase[,] or otherwise, acquires all or substantially all of the assets or the business of the Company.

> 11. Benefit. This Agreement shall be binding upon and inure to the benefit of RGIS and its successors and permitted assigns, and Employee.

Also, there is no dispute that WIS now owns the business of RGIS.[12] And WIS's Executive Vice President of National Accounts testified that after the acquisition, the RGIS employees who had worked on Walmart inventories had moved into his reporting structure:

> Q. And what happened to -- if anything, to the people who were at RGIS who [had] worked on Walmart inventory business?
>
> A. Their reporting structure was re-aligned[,] and they immediately reported to me.
>
> Q. Okay. So since May of 2021, the folks that were at RGIS working on Walmart inventory services and now are working with WIS report to you, is that correct?
>
> A. Yes.

Other than a passing reference in a footnote, Datascan does not challenge that an assignment occurred, nor does it parse the language that "[t]his [a]greement may and shall be assigned or transferred to any successor of RGIS, and any such successor shall be deemed substituted for all purposes of RGIS under the terms of this [a]greement." Nor does Datascan's reply brief challenge WIS's cited authority, which holds that the covenants contained in the agreements passed automatically; for example, authority that states:

---

[12]Exactly when the acquisition occurred is not clear from the record. A purchase-and-sale agreement is dated May 20, 2021. A contribution agreement is dated January 1, 2023. A WIS witness testified that the plaintiff WIS entity owns "the business of RGIS" and that happened in "May of 2021" and later said, "WIS that is the plaintiff here was assigned the ownership of RGIS January 1st" 2023.

47

[Defendant] argues that he did not consent to an assignment, and that there is no proof that the Consent Decree was ever assigned. Covenants not to compete are assignable. *Thames v. Rotary Eng'g Co.*, 315 S.W.2d 589, 590 (Tex. . . . App.[—El Paso] 1958, writ ref'd n.r.e.). By its acquisition of [plaintiff], Exide [(another company operating in the same line of business)] acquired [plaintiff's] right to enforce the Consent Decree. An express assignment to Exide is unnecessary. "Upon a subsequent sale of a business, such covenant will pass as an incident of the business even though not expressly assigned." *Wells v. . . . Powers*, 354 S.W.2d 651, 654 (Tex. . . . App.[—Dallas] 1962, no writ); *Williams v. Powell Elec. Mf[g]. Co*[.], 508 S.W.2d 665, 667 (Tex. . . . App.[—Houston [14th Dist.]] 1974, no writ) (express assignment of covenant not to compete unnecessary between a company and its wholly[ ]owned subsidiary); *Abramov v. Royal Dall*[.]*, Inc.*, 536 S.W.2d 388, 390 (Tex. . . . App.[—Dallas] 1976, no writ) (no need for an express assignment of a covenant not to compete between successors in interest). [Defendant] consented to assignment of [plaintiff's] rights in the Consent Decree itself. No further consent was required. *See* [*Tex. Shop*] *Towel*[*, Inc.*] *v. Haire*, 246 S.W.2d 482, 484 (Tex. . . . App.[—San Antonio] 1952, no writ) (where an employee makes a contract restricting his right to compete and provides further that the contract is assignable, the employer may assign the contract). *Thames* is not to the contrary. Although in *Thames* the court analyzed whether the employee consented to the assignment by continuing to work for the employer, *see* 315 S.W.2d at 591, there is nothing in the court's decision to indicate that there was an assignability provision in the contract.

*Int'l Power Machs. Corp. v. Power Specialists, Inc.*, No. 3:91-CV-0643-D, 1996 WL 722074, at *1, *3 (N.D. Tex. Dec. 6, 1996) (mem. op. and order) (footnote omitted).

Indeed, a more recent federal case dealt with a situation somewhat analogous to the instant one. *Visual Edge IT, Inc. v. Vaughan*, No. 4:20-CV-04220, 2022 WL 9392564 (S.D. Tex. Oct. 13, 2020) (mem. and order). *Visual Edge* dealt with the sale of one company to another. *Id.* at *1. Two employees had executed nondisclosure and noncompete agreements with the purchased company and refused to execute new

48

ones with the buyer. *Id.* Both began working for a competitor of the buyer. *Id.* The buyer sued the former employees and their new employer. *Id.* at *2. When sued for breach of contract for "providing confidential information to [their new employer] and soliciting [the buyer's] employees and customers to the competitor company," the employees argued that their contracts were personal-services contracts that were not assignable. *Id.*

The federal court initially noted that "Texas law presumes contracts are freely assignable." *Id.* at *3 (citing *Dittman v. Model Baking Co.*, 271 S.W. 75, 77 (Tex. Comm'n App. 1925, judgm't adopted)). *Visual Edge* then went on to catalog a host of cases that concluded covenants not to compete were assignable:

> Texas lower courts have repeatedly found that restrictive covenants are not themselves personal[-]service contracts. *See, e.g.*, *TPS Freight Distrib[s.], Inc. v. Tex[.] Com. Bank-Dall[.]*, 788 S.W.2d 456, 459 (Tex. App.[—Fort Worth] 1990[, writ denied]) (distinguishing personal[-]service contracts from those in which the contractor agreed to "refrain from doing something"); *Thames* . . . , 315 S.W.2d [at] 590 . . . ("[W]e do not find any inhibition against the assignment or transfer of this type of covenant or agreement. These are not agreements to work[] but are restrictive agreements promising not to compete. It has been held that such are transferrable or assignable as assets."); *see also In re Wofford*, 608 B.R. 494, 497 (Bankr. E.D. Tex. 2019) ("The former requires affirmative actions by the employee, whereas the latter requires only that they refrain from certain actions.")[.] Courts beyond Texas also recognize this distinction. *See, e.g.*, *Symphony Diagnostic Servs. No. 1 Inc. v. Greenbaum*, 828 F.3d 643, 647 (8th Cir. 2016) ("[T]he fact that [the parties] signed the non[]compete and confidentiality agreements in consideration for continued employment did not transform those agreements into personal[-]services contracts[] because the agreements imposed no obligation on them to take any affirmative action."); *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 929 (6th Cir. 2000) . . . ("A personal[-]services contract, however, requires that one of the

49

parties be bound to render personal services. In contrast, a noncompetition clause only requires that one of the parties abstain from certain activities." [(internal citation omitted)]); *In re Andrews*, 80 F.3d 906, 912 (4th Cir. 1996) ("Although the Thirteenth Amendment prohibits a court from specifically enforcing a personal[-]service contract, an agreement not to compete is specifically enforceable if it is reasonable.").

*Id.* The opinion concluded that the covenants it reviewed were assignable.[13]

Datascan tries to thwart any effect of the assignment of the covenants not by arguing that the covenants were not assignable or actually assigned but that "in order for the RGIS [a]greements to protect WIS and WIS's confidential information or [to] prevent FMEs from competing with *WIS*, the RGIS [a]greements would need to be modified." One may fairly ask: if the agreements had to explicitly be modified, then what is the purpose of the provision in the agreements stating that they could be assigned? This is a point made by WIS in its brief in response to Datascan's argument:

> [Datascan's] argument that WIS cannot enforce the [a]greements because it did not modify them is flat wrong. As an initial matter, the contention that WIS can only prevent the FMEs from competing with RGIS, not WIS, is nonsensical given the acquisition. Moreover, this interpretation would render the assignability provision in the [a]greements meaningless—violating a well-established contract principle to give effect to the entire agreement. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). [Brief reference omitted.]

And Datascan's argument ignores the very terms of the assignment provision that "[t]his [a]greement may and shall be assigned or transferred to any successor of RGIS,

---

[13]*Visual Edge* distinguished an opinion from the Tyler Court of Appeals that involved a contract that integrated personal services and covenants. 2022 WL 9392564, at *4 (discussing *Intertek Asset Integrity Mgmt., Inc. v. Dirksen*, No. 12-20-00060-CV, 2021 WL 1047055, at *6 (Tex. App.—Tyler Mar. 18, 2021, no pet.) (mem. op.)).

and any such successor *shall* be deemed substituted for all purposes of RGIS under the terms of this [a]greement." [Emphasis added.] If WIS as successor is substituted for all purposes, why is there a need to modify the agreements to substitute WIS as the beneficiary of the agreements?

At this preliminary stage, we conclude that the trial court did not abuse its discretion by concluding that WIS has a probable right of recovery against Datascan for tortious interference of certain of the agreements that employees signed with RGIS that were made applicable to WIS as RGIS's successor.[14]

We overrule Datascan's sixth subissue of its first issue.

Except to the extent that we remand this matter to the trial court for it to consider whether the scope of activity in the covenants referenced in the injunction order should be modified, we overrule Datascan's first issue.

**C.     Datascan argues in its second issue that the trial court abused its discretion by issuing its injunction order because WIS "failed to produce evidence on a probable right to relief on its claims." WIS offered sufficient proof to support the trial court's decision.**

Datascan's second issue is a catalog of reasons why it contends that WIS failed to establish a probable right to recovery, including an absence of proof that (1) Datascan used WIS's protectable information, (2) the FMEs breached their fiduciary duties, and (3) WIS suffered actual damages as a result of Datascan's

---

[14]We note that the RGIS agreement with Snead's husband is of a different form than the other two RGIS agreements in the record and contains a stipulation that it is a personal-employment contract.

51

interference with WIS's contract with Walmart. We overrule the first two subissues and do not reach the third.

### 1. The trial court did not abuse its discretion by issuing the injunction order because WIS failed to offer proof that Datascan used any of WIS's protectable information.

Datascan's first subissue under its second issue is that WIS has nothing confidential to protect, that WIS conceded this fact by acknowledging that the only information that the FMEs had was what they carried in their heads, and that the record establishes that Datascan "neither has, nor wants" WIS's confidential information because Datascan used its own technology and Walmart's specifications in developing its Walmart inventory process. WIS counters that it has established that it indeed has confidential information in the form of "its financial information, employee information, its software and internal reports, and the rates charged by WIS" and in the "unique and specialized processes and procedures on the Walmart account." The question is a close one, but there is enough in the record to sustain the trial court's exercise of its discretion.[15]

---

[15]We also quote the specific testimony that Datascan cites to support certain of the statements in its brief. Datascan states that the fact that there is an absence of evidence that the FMEs took anything with them "was confirmed by Jillian Sanders, a WIS Regional Director, who testified [that] she has no evidence that any FME has any WIS confidential information other than general knowledge and skills obtained on the job." The testimony cited in support of this conclusion is not as blanket of a concession as Datascan portrays it to be:

Q. Do you have any evidence that the WIS employees who now work for Datascan have WIS confidential information with them?

52

For all the noise in the briefing, this subissue comes down to one question: Is it arguable that WIS created confidential processes in conducting Walmart inventories, or are the FMEs simply using general knowledge and skills that are not protectable as confidential information? In our initial summary, we have already listed evidence, such as the manual that WIS created to govern Walmart workflow. We have also outlined the testimony that WIS offered regarding how Walmart had told it what it

A. I don't have any proof that they have confidential information per se. I have not spoke[n] to any of these people. But I do know that the knowledge that they gained at WIS is all confidential.

Q. All of it?

A. Well, the things that we share with our employees are confidential.

Next, Datascan asserts that "[WIS Executive Vice President of National Accounts] further testified that WIS did not even have evidence that Datascan has received or used WIS's purported confidential information contained in the FME[s'] heads." The testimony cited to support this statement is as follows:

Q. Okay. You don't have any evidence that Datascan has anything of yours other than what is in the former manager[s'] head[s]; isn't that true?

A. Yes.

Q. And you don't know if those former managers are using what's in their head[s] for Datascan?

A. *I believe they are.*

Q. But you don't know that; you don't have evidence that they are?

A. Yes. [Emphasis added.]

53

wanted accomplished but had left it to WIS to figure out the process. WIS's brief

goes on to emphasize various testimony:

- Walmart has a different inventory process than any other retailer, and it has "a very sophisticated process with very rigid parameters and expectations and, from a technological standpoint, more advanced than any other retailer's inventory program."

- WIS has continuously fine tuned the Walmart inventory process:

  Well, I mentioned earlier that Walmart tells you what to do but not how to do it. So what we do with our management team and we've established over years of trial and error and on-hand experience is [the most] efficient process possible to execute the inventory under the parameters that Walmart has given us, exceeding even their best expectations in terms of scoring.

  And this is achieved through numerous steps including resource allocation, including internal reporting, all these things that are critical to the execution of the inventory.

- Specialized training was required for Walmart inventories:

  Q. Could you please describe your transition when you joined the Walmart team from the . . . previous team you worked on?

  A. Yes. When I joined the Walmart team, I didn't have any experience in working in Walmart. I had never worked with that account before. So there was a lot of specific training that was needed to, you know, get me prepared to run my team.

  Q. And how long did that training last?

  A. The training last[ed], to make me comfortable, for about eight weeks before I was left alone.

Q. And did someone with Walmart experience train you?

A. Yes.

Q. If you had not had someone with Walmart experience training you, . . . how do you believe your training would have gone?

A. It would have been very difficult. There's a lot of very specific and specialized training for Walmart in regards to how we, you know, just run the entire process.

- The employees were trained with respect to the Walmart app process.

- The manual, which has been described, was compiled:

Q. Did you have a hand in preparing Exhibit 56 [the manual]?

A. Yes, I did.

Q. Could you please describe that?

A. Yes.

[W]hen [the] app rolled out, we all got together, myself and my other partners that are regionals as well as Darryl Herman [(WIS Vice President of Operations for Walmart)], and we sat down and went through everything and put this manual together as far as what we wanted our training to look like, how we wanted to run our very unique process that we have as far as getting through our inventories with the flows and the timelines. But, yes, we all had a hand in creating this.

Q. About how long would you say it took you to develop the information contained in Exhibit 56?

A. We sat down for a week and we put this together.

Q. What -- when did you start working on this process first?

55

A. Oh, goodness. Well, this was after I became a regional, which was in July . . . 2019. And this would have happened -- we did this at the end of 2019 prior to going into our new season in 2020.

Q. And then you would revise it as needed?

A. Yes, we would revise it annually.

- WIS takes various actions to maintain its ACE score, which is the grading system that Walmart uses:

Q. And does that come from Walmart or is there any specific WIS-specialized knowledge that you have regarding ACE?

A. It does come from Walmart. But the difference[] . . . is that with this manual and . . . the training that we do with our crews, it helps us to improve our efficiency.

So whether that's through staffing, you know, more training, you know, getting out of stores on time, all those different things, we . . . strive to give the best service to Walmart, so our metrics are very important. So with that being said, like, we do additional training to make sure that we can get the best ACE scorecard number.

Q. What about the wrap-up process, is there anything specialized that WIS . . . has done related to the wrap-up process?

A. Yeah, so the wrap-up process is unique in a way that -- first of all, it's very detailed. Usually by the time that we finish counting, Walmart -- you know, they're well underway in doing their recounts and we are now receiving data back from Walmart.

And in that data that's coming back, we're . . . receiving discrepancies, which means Walmart has found some errors and they've assigned [each error] a code, whether it's a service miscount . . . or it's a prep issue on Walmart's behalf.

56

We then go out and we do additional research for Walmart because Walmart, I'll be honest, . . . they're not the best at counting. So we follow up with them to ensure that . . . everything is accurate with that piece.

It's more detailed in the . . . aspect that we have to wait for every zone to come back and be completed by both sides prior to being able to transmit our inventory.

Q. And so what has WIS done that's special in the wrap-up process just to make it better than --

A. We've had some system improvements that ha[ve] helped us to improve our process. You know, our managers are trained -- we have some different reporting also that we look at that's more detailed so we can identify issues, you know, . . . on a quicker level.

That's . . . pretty much it.

Juxtaposed against this testimony is Datascan's conclusion that "WIS has failed to establish how the knowledge contained in FMEs' heads[—]including their working knowledge of how to conduct a Walmart inventory count, which even WIS hourly employees know and FMEs learned as hourly employees and/or before signing [r]estrictive [c]ovenants[—]qualifies as protectable confidential information." In a footnote, Datascan supports this conclusion by highlighting the testimony of an FME that

Walmart has provided consistent guidelines and instructions to all three of the inventory companies he has worked at, including RGIS, WIS, and Datascan[;] that these instructions of how to perform Walmart inventories were not treated as "confidential"[;] and [that] the entire teams of employees had access to them. Moreover, [the FME] "knew and understood the Walmart procedures *before* going to work for WIS

57

and *before* being governed by any non[]compete agreement while working for RGIS." [Record reference omitted.]

In the blizzard of arguments made by the parties, no one explicitly points us to the test we should use to determine if confidential information exists as WIS claims. Datascan points us to our opinion in *Phuong Nguyen v. ABLe Commc'ns, Inc.*, No. 02-19-00069-CV, 2020 WL 2071757, at *5 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.). Datascan argues that in *Nguyen*, we held that there was not sufficient information in the record to conclude that information held by a former employee warranted protection. In *Nguyen*, we applied the test for trade secrets found in the Texas Uniform Trade Secrets Act (TUTSA) as follows:

> Under TUTSA, information qualifies as a "trade secret" if it meets two requirements: (1) "the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

*Id.* at *16.[16] Because Datascan relies on *Nguyen*, we will apply the test it utilized.

---

[16]The full test in the statutory definition is as follows:

> "Trade secret" means all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if[]

58

Here, the testimony that we have outlined supports an inference that WIS had developed a unique and valuable process to conduct complicated Walmart inventories—testimony which Datascan never confronts—and we apply a standard of review asking whether "the applicant [ ] present[ed] enough evidence to raise a *bona fide* issue as to its right to ultimate relief." *See Hernandez*, 2021 WL 520456, at *6. There is some evidence that the inventory procedures that WIS developed met the test of "not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Nguyen*, 2020 WL 2071757, at *16. This is sufficient to support the trial court's exercise of its discretion to issue a temporary injunction that has the purpose of freezing the status quo until a full record may be developed.[17]

---

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

[17]In its reply brief, Datascan shifts partially to an argument that it fired an employee who had tried to obtain WIS rates and that a computer expert's testimony was very uncertain regarding whether an FME had downloaded confidential information before leaving WIS. We do not rely on either act to support our conclusion that the trial court did not abuse its discretion by issuing the injunction.

Datascan also highlights that Snead did not have confidential information about the Walmart inventory process and uses this as a basis to attack the trial court's

59

We overrule Datascan's first subissue under its second issue.

**2.      The trial court did not abuse its discretion by issuing the injunction order because WIS failed to offer proof that the FMEs breached a fiduciary duty owed to WIS.  The evidence raised a bona fide issue of breach.**

Pivoting off its challenge that WIS has no confidential information to protect, Datascan's second subissue under its second issue is that WIS failed to produce evidence that the FMEs breached their fiduciary duties.  Datascan concedes that a terminated employee may breach a fiduciary duty by divulging a former employer's trade secrets.  *See T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).[18]   Here, Datascan's argument

---

finding that "[i]t is highly probable that, if G. Snead is not restrained, she will take, use[,] and/or disclose WIS's Confidential Information to the detriment of WIS."  The knowledge that Snead had the information needed to solicit WIS employees was described as follows:  "[Snead,] being a human resource regional training acquisition manager, . . . would have access to hundreds, thousands of people because she would . . . hire for teams across the country, and also she took part in internal promotion as well."  Thus, the contention that Snead lacked confidential information on the Walmart inventory process is wide of the mark.

[18]The specific holding of *T-N-T* is as follows:

Certain duties, apart from any written contract, arise upon the formation of an employment relationship. *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ).  One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. *Id.*  This obligation survives termination of employment. *Id.*  Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment.

turns on acceptance of its prior argument that WIS has nothing confidential to protect:

> As discussed above, the information WIS seeks to protect here is not protectable confidential information because it is general knowledge, skills, and experience FMEs acquired during their employment with WIS (and, for some, before their employment with WIS and before they were governed by any [r]estrictive [c]ovenants). Moreover, the guidelines for conducting a Walmart inventory are dictated by Walmart and are the same no matter which inventory company a person works for, whether RGIS, WIS, or Datascan. As such, FMEs' use of such information cannot support a cause of action for breach of fiduciary duty (and thus[] cannot support a cause of action against Datascan for knowing participation in breach of fiduciary duty). [Record references omitted.]

But we just rejected Datascan's argument that the record is bereft of evidence of a trade secret or confidential information. That holding also disposes of Datascan's present argument.

In a temporary-injunction context, the protestation that former employees are not using confidential information is of little avail when they are doing the same job

---

> *Id.* at 600–[]01; *Am*[.] *Precision Vibrator Co. v. Nat*[*'*]*l Air Vibrator Co.*, 764 S.W.2d 274, 278 (Tex. App.—Houston [1st Dist.] 1988, no writ).

> When a claim of improper disclosure or use of trade secrets arises from a confidential relationship, the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence. *Gonzales v. Zamora*, 791 S.W.2d 258, 265 (Tex. App.—Corpus Christi[–Edinburg] 1990, no writ). However, the employer must show that the information was, in fact, a trade secret. *Am*[.] *Precision*, 764 S.W.2d at 279.

*Id.* at *21–22.

that they did for their former employer that involves the use of confidential information. As we noted in a prior opinion,

> [T]he argument that [Appellee] cannot provide direct evidence tying Individual Appellants' actions to a loss of policyholders is a variant of an argument that we rejected in a parallel case. Specifically, in *Tranter . . .*, we rejected Individual Appellants' argument and applied the presumption even in the absence of direct evidence of the use of confidential information by the former employee because of the inevitability that the former employee would use confidential information under those circumstances. *See* 2014 WL 1257278, at *8. We rejected their argument because "[r]ather than rebutting the presumption, this evidence demonstrates precisely why the presumption exists," namely, because "the former employee working in a similar capacity can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work." *Id.* (citing *Daily Instruments . . .*, 998 F. Supp. 2d [at] 569 . . . ); *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 472 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)).

*Hernandez*, 2021 WL 520456, at *19. The simple fact that the former employees are carrying information in their heads is not a bar to the conclusion that they may be using confidential information. Thus, we reject Datascan's argument that "[t]he [t]rial [c]ourt abused its discretion [by] granting injunctive relief based upon FMEs' alleged breaches of their fiduciary duties and/or Datascan's alleged aid of such breaches."[19]

---

[19]Datascan raises another argument buried in footnote 32 of its brief:

> The findings in this paragraph state the [t]rial [c]ourt found that each FME "had employment agreements with WIS containing confidentiality, non[]solicitation, and non[]competition obligations." There is no evidence in the record that . . . Snead, [her husband, or two other FMEs had] signed employment agreements with WIS containing these types of provisions[,] and the defined term "Confidentiality Agreements" is not

We overrule Datascan's second subissue under its second issue.

### 3. We do not reach Datascan's argument that WIS failed to offer proof that Datascan's actions caused any damage to WIS by interfering with WIS's contract with Walmart.

In its final argument under its second issue, Datascan attacks the evidence supporting WIS's pleaded claim that Datascan interfered with WIS's contracts with Walmart. As a footnote in Datascan's brief acknowledges, it is unclear whether the trial court relied on a probable right of recovery on such an interference claim to support the temporary injunction:

> The only finding that even potentially discusses Datascan's alleged interference with WIS's customers states "it appears to the [c]ourt that [ . . . ] Datascan is presently engaged in, or will engage in, tortiously interfering with WIS's agreements with employees and customers." This reference to "WIS's agreements with employees and customers" is vague and non[]specific in violation of Rule 683.

Further, WIS pleaded a claim for tortious interference with the FMEs' agreements. The basis for that claim is attacked in the myriad arguments that we have already discussed. Because it is unclear that the trial court even considered the tortious-interference claim attacked by Datascan in the present subissue as a basis for the temporary injunction, we will not further lengthen this opinion by prejudging whether the cause of action has any validity.

---

used. Accordingly, this finding is unsupported by the evidence in the record and was an abuse of discretion.

It appears that this is a rehash of the argument that WIS cannot rely on the RGIS agreements—an argument that we have already rejected.

We overrule Datascan's second issue, except to the extent that we do not reach

its third subissue.

**D.     Datascan argues in its third issue that the trial court's injunction order failed to meet the requirements of Texas Rule of Civil Procedure 683 in a number of particulars.**

Datascan's third issue launches a series of attacks on the form of the injunction

order. We conclude that Datascan's arguments have merit and will sustain them.

**1.     We set forth the specificity requirements contained in Texas Rule of Civil Procedure 683.**

Texas Rule of Civil Procedure 683 governs the form of an injunction order.

Tex. R. Civ. P. 683. As we have noted in a prior opinion,

> [Rule 683] dictates that an injunction order "shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." *Id.* "An injunction must be definite, clear, and concise, leaving the person enjoined in no doubt about his duties[] and should not be such as would call on him for interpretations, inferences, or conclusions." *Vaughn v. Drennon*, 202 S.W.3d 308, 316 (Tex. App.—Tyler 2006, no pet.) (citing *Gulf Oil Corp. v. Walton*, 317 S.W.2d 260, 264 (Tex. App.—El Paso 1958, no writ) (per curiam)).

*Hernandez*, 2021 WL 520456, at *22. The requirements of Rule 683 are mandatory and

should be strictly followed. *Id.* at *23.

**2.     We sustain Datascan's challenge to the injunction order because it fails to specify which WIS customers Datascan is restrained from dealing with.**

Datascan's first subissue under its third issue attacks the form of the injunction

order that restrains Datascan from interfering with "any contracts or agreements WIS

has with any current clients or customers" because it does not identify who those

customers—other than Walmart—are. We agree that the injunction order contains the flaw that Datascan raises.

As we have chronicled, the primary contention of WIS is that the FMEs are importing to Datascan the unique knowledge of how WIS conducts a Walmart inventory. The record is almost bereft of information about the work that the FMEs did for other WIS customers or how information relating to those customers could be used. Certainly, there was general testimony about broad categories of information that WIS considered confidential, but that information was not tied to a customer of WIS other than Walmart.

The injunction order contains a sweeping definition of confidential information:

> The [c]ourt finds that, among other things, WIS provided the [FMEs] access to WIS's confidential information pertaining to inventory[-]services business, which the [c]ourt finds includes: WIS's financial information, including detailed profit[-]and[-]loss statements; pricing information pertaining to its customers, including rates paid by Walmart for WIS's inventory services; employee-specific information, including contact lists, rosters, team and territory lists, compensation, skill level, specialized WIS employee training and training methods; daily reports on the performance of each [FME's] team with comparison to other teams; WIS's best practices and methods for performing inventory services for its customers, including practices and methods for performing services for Walmart, meeting Walmart's specifications, and performing services effectively and efficiently for Walmart; detailed training and information about WIS's inventory processes and technology that are specifically tailored to Walmart; reports and information reported to Walmart, information contained in and pertaining to [WIS's software], including all reports, analytics and other information that can be obtained and run through these systems to

facilitate the provision of inventory services, and WIS's software . . . and information contained therein ("Confidential Information").

The definition expands the universe of information that WIS seeks to protect from just the Walmart-specific information (which is the focus of its claims) to all information that relates to customers of WIS unidentified in the record. WIS's brief attempts to justify a broad sweep with the statement that "[t]he FMEs spent a considerable amount of time at WIS before leaving[] and worked for different customers other than Walmart, making them sufficiently familiar with WIS['s] business and customers." The record reference that WIS provides contains no support for the statement. Further, some of the categories of information listed in the definition of "Confidential Information" are never even mentioned in the testimony.

The injunction order then carries forward the sweeping definition of Confidential Information into specific restraints that Datascan challenges:

> f. *Datascan will* refrain from recruiting or soliciting, or attempting to recruit or solicit, directly, indirectly or by assisting or encouraging others, any persons formerly or currently employed by WIS *for the purpose of obtaining WIS Confidential Information or utilizing any WIS Confidential Information or Former Management Employees* **to induce** *WIS customers,* **including** *Walmart, to divert, withdraw, curtail or cancel any of their inventory services business with WIS*;

> . . . .

> h. [Defendants are temporarily enjoined from] *utilizing any WIS Confidential Information* or any Former Management Employees **to interfere** *with any contracts or agreements WIS has with any current clients or customers,* **including** *Walmart,* to provide inventory services, or directly or indirectly, or by assisting or encouraging others, to take any steps to cause any current client or customer of WIS, including Walmart, to

66

divert, withdraw, curtail or cancel any of its business with WIS. [Emphasis added in italics and bold.]

In simple terms, the injunction order transforms the nature of this case from one dealing with Datascan's alleged efforts to pirate confidential information relating to one client into a restraint that puts Datascan in jeopardy for soliciting unidentified clients from WIS's expansive client list because of some inchoate relationship with the FMEs or broadly and nebulously defined confidential information. The injunction order does this even though the record does not tell us who those other clients are, what "confidential information" is generated with respect to those clients, or how the FMEs were exposed to that unidentified information. As Datascan crystalizes this argument in its reply brief:

> [A WIS executive] testified that WIS's customers included "[b]asically every major retailer in America." But, rather than identify customers other than Walmart, the trial court imposed a sweeping injunction against Datascan from[]
>
>> utilizing any . . . [FME] to interfere with any contracts or agreements WIS has with *any current clients or customers*, including Walmart, to provide inventory services, or directly or indirectly, or by assisting or encouraging others, to take any steps to cause any current client or customer of WIS, including Walmart, to divert, withdraw, curtail[,] or cancel any of its business with WIS.
>
> The universe of WIS's clients is known only to WIS, so Datascan is left only to guess. Moreover, the record is devoid of evidence that Datascan's potential competition with these unknown customers would implicate any of WIS's Confidential Information since FMEs were only privy to information related to Walmart, who is very different from any other client. [Record references omitted.]

WIS tries to sustain the breadth of the provision by relying on authority that we do not find persuasive. The primary citations that WIS musters to support the breadth of the injunction hold that an injunction order need not identify clients by name or that "an injunction order will not be found to be overly broad if the order enjoins a former employee from soliciting its former employer's customers without specifically stating the customers' names." *See Thomas*, 2020 WL 5269412, at \*6; *Lockhart v. McCurley*, No. 10-09-00240-CV, 2010 WL 966029, at \*4 (Tex. App.—Waco Mar. 10, 2010, no pet.) (mem. op.).

The Dallas Court of Appeals explained why the primary citation that WIS relies on misses the mark when an injunction restrains a third party without personal knowledge of whom an employee had dealt with because such a provision requires the restrained party to speculate regarding what conduct it may engage in:

> We turn to appellants' second issue in which they complain of the order's failure to specifically identify the [appellee's] clients or customers whom appellants are prohibited from soliciting or contacting. Paragraph 21(ii) enjoins appellants from soliciting or contacting "any client or customer of [appellee] that [individual appellant had] interacted with as a client or customer from July 2012 to July 27, 2017." Paragraph 21(iii) enjoins appellants from soliciting or contacting "any client or customer of [appellee] of whom [individual appellant had] retained confidential information." Appellants contend the order needs to name the clients or customers or at least reference a list of prohibited customers.
>
> In *Computek Computer & Office Supplies, Inc. v. Walton*, this [c]ourt considered whether an injunction that failed to name the clients Computek was prohibited from contacting complied with [R]ule 683. 156 S.W.3d 217 (Tex. App.—Dallas 2005, no pet.). The injunction in that case enjoined Computek from doing business or authorizing anyone else to do business with any client of another business not listed on an

68

attachment to the order. While the clients Computek could contact were identified, the clients it could not contact were not named or identified. *Id.* at 221. We determined that because the injunction itself did not provide the specific information as to the off-limits clients, without inferences or conclusions, the trial court's injunction lacked the required specificity. *Id.* at 222–23.

[Appellee] maintains that the injunction in this case is sufficiently specific because it states clients or customers "that [individual appellant had] interacted with as a client or customer" and "of whom [individual appellant had] retained confidential information." [Appellee] asserts this language put appellants "on notice of exactly who they ma[y] not contact by restricting those customers to clients [individual appellant] would be intimately familiar with." But this language requires inferences or conclusions to be drawn in order to determine whom appellants may not contact. As in *Computek*, the injunction itself does not provide the specific information about who[m] the off-limits clients and customers are, and the lack of specificity cannot be cured by any knowledge [that individual appellant] may have outside the injunction. *See id.*; *see also Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 553 (Tex. App.—Dallas 1993, no writ) (injunction order that prohibits party from soliciting customers listed in sealed exhibits admitted into evidence at injunction hearing did not violate [R]ule 683). [Appellee] relies on a Waco [C]ourt of [A]ppeals['] case, which in turn relies on a case from this [c]ourt, for the proposition that an injunction need not identify the clients by name because it is reasonable to presume the employee is sufficiently familiar with the customers' identities to avoid violating the injunction. *See Lockhart . . . , . . .* 2010 WL 966029, at *4 . . . ; *see also Safeguard Bus. Sys, Inc. v. Schaffer*, 822 S.W.2d 640, 644 (Tex. App.—Dallas 1991, no writ). These cases are factually distinguishable because the only party enjoined from contacting customers was the employee. In this case, the employee [individual appellant] is not the only party enjoined from contacting [appellee]'s clients; [corporate appellant] is as well and cannot be presumed to have knowledge of who[m] [individual appellant had] interacted with as a client at [appellee]. We conclude that in failing to sufficiently identify the off-limits customers or clients, the order lacks the specificity required by [R]ule 683.

*McCaskill v. Nat'l Cir. Assembly*, No. 05-17-01289-CV, 2018 WL 3154616, at *4 (Tex.

App.—Dallas June 28, 2018, no pet.) (mem. op.).

The provisions under attack restrain Datascan from inducing or causing unidentified clients from taking certain actions. WIS's argument mimics the argument rejected by *McCaskill*—that because the FMEs might know who they dealt with, Datascan can be certain who it should not deal with. Further, Datascan is restrained from using broad classes of confidential information for clients that are not only unidentified in the order but also are not even specifically identified in the record as WIS clients. This again leaves Datascan not only to speculate who the clients and customers are but also to guess whether the information falls within the definition of confidential information. We conclude that paragraphs f. and h. in the restraints of the injunction order fail to meet the specificity requirements of Rule 683.

We sustain Datascan's first subissue under its third issue.

**3.    We sustain Datascan's challenge to the injunction order because of its use of the words "in competition with" in describing whom Appellants are prohibited from engaging in business with.**

In a one-paragraph argument supporting its second subissue under its third issue, Datascan challenges the injunction order's use of the words "in competition with WIS" in two of the order's provisions. The two provisions are as follows:

> e.  for a period of one (1) year, G. Snead is prohibited from (i) engaging in any inventory services line of business in competition with WIS . . . ;
>
> . . . .
>
> g.    [Defendants are temporarily enjoined from u]tilizing any Former Management Employee (except Tamatha Rountree) to (i) engage in any business activity or work that is in competition with WIS . . . .

Datascan claims the provisions are vague because it "cannot determine if *all work* in inventory services is considered to be 'in competition with WIS,' or if there are some positions in inventory services for some of Datascan's customers that would not be considered 'in competition with WIS.'" WIS defends the provisions by arguing that the complained-of language in conjunction with the overall terms of the order obviates any vagueness and does so by tying such provisions to the confidential-information provisions of the injunction order.

But it appears that the provisions in question are intended to create restraints not based on the use of confidential information but on the noncompete provision of the FMEs' agreements. For example, Snead's agreement provides that she shall not "engage in any business activity or work that is in any way competitive with any [b]usiness of RGIS." Analogous authority holds that such an all-encompassing injunction provision is vague.[20] And this provision is particularly troubling in view of

---

[20]We note that there is authority that a provision similar to the ones challenged by Datascan may be impermissibly vague. The Beaumont Court of Appeals reviewed language that is not identical, but is similar, to that used in the injunction order and opined that

> [t]he last paragraph of the order, which restricts [appellant's] "direct or indirect involvement with business which is in direct competition with the particular business lines of [appellee]" is likewise vague. For instance, would [appellant's] direct or indirect involvement include working for Cypress Creek in some role other than as a salesman[] or working for Cypress Creek as a salesman but soliciting customers to purchase products that fall outside the restrictions of [appellant's] agreement with [appellee]? While it is possible that the trial court would

Datascan's argument that the scope of activity in the covenants is unreasonably broad.[21]  In view of the vagueness of the injunction provision and the argument that the scope-of-activity restriction in the covenants should be reformed to narrow it before it is enforced by injunction, we will remand.  Thus, the trial court can address the issue of the challenged language as part of its consideration of the complaint about the breadth of the restraint.

We sustain Datascan's second subissue under its third issue.

### 4.    We sustain Datascan's challenge to the injunction order because its breadth prohibits the defendants from engaging in lawful activities.

Datascan in its third subissue under its third issue challenges the injunction order for being so broad that it prohibits engaging in lawful activity.[22]  The argument

---

not hold [appellant] in contempt for engaging in these activities, the language in the order is less than clear.  Nevertheless, the parties—undertaking in good faith to comply with that party's respective understanding of the scope of the order—could be misled by the scope of the trial court's order.  Consequently, we agree with [appellant] that the trial court's order does not comply with the requirements of Rule 683.

*Dickerson v. Acadian Cypress & Hardwoods, Inc.*, No. 09-13-00299-CV, 2014 WL 1400659, at *7 (Tex. App.—Beaumont Apr. 10, 2014, no pet.) (mem. op.).

[21]We discuss these contentions in detail in Section II.B.1. of this opinion.

[22]*See Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Grp. Holdings, Inc.*, 374 S.W.3d 488, 502 (Tex. App.—Dallas 2012, pet. denied) ("In a case involving trade secrets or confidential information, the injunction must be narrowly tailored to address the improper use of confidential or proprietary information.  Further, the

then somewhat morphs into one that challenges the specificity of the terms contained in the injunction order. We agree that the terms of the order lack the specificity required by Rule 683.

The challenge focuses on paragraph b. of the injunction order that restrains Datascan from

> using, disclosing or transferring, or assisting or encouraging others to use, disclose[,] or transfer[] any WIS Confidential Information, knowledge, know-how, reverse know-how, documents, data, or other intellectual property of WIS, including, but not limited to, any WIS Confidential Information, knowledge, know-how, reverse know-how, documents, data[,] or other intellectual property that any [FME] received, maintained, developed[,] or had access to during or after the course of his or her employment at WIS . . . .

Datascan cites cases holding that injunction orders that contain general, undefined terms restraining a party from the use of information are not specific enough to meet the requirements of Rule 683. For example, the Dallas Court of Appeals criticized an injunction order for using general, undefined terms as follows:

> [T]he order . . . states, "The [c]ourt further finds that the CROSSMARK Confidential Information and Trade Secrets and other confidential and proprietary business information of CROSSMARK and business relationships of CROSSMARK are assets belonging solely to CROSSMARK." The terms "confidential," "proprietary," and "business information" are not defined or explained anywhere in the order, nor does the order's context clarify them in any discernable way. These undefined terms are used in provisions (b), (d)(ii), (i), (j)[,] and (k). These terms are vague and fail to provide adequate notice to appellants

---

injunction must not be framed so broadly as to prohibit the enjoyment of lawful rights." (citation omitted)).

of the acts they are restrained from doing in terms not subject to reasonable disagreement.

*Retail Servs. WIS Corp. v. Crossmark, Inc.*, No. 05-20-00937-CV, 2021 WL 1747033, at *12 (Tex. App.—Dallas May 4, 2021, pet. denied) (mem. op.) (footnote omitted); *see Ramirez v. Ignite Holdings, Ltd.*, No. 05-12-01024-CV, 2013 WL 4568365, at *4 (Tex. App.—Dallas Aug. 26, 2013, no pet.) (mem. op.) (holding that provisions of the temporary-injunction order lacked necessary specificity because of the failure to define "Proprietary Information/Trade Secrets" with "enough specificity to give appellants notice of the acts they are restrained from doing").

Here, the first sentence of paragraph b. uses the defined term "Confidential Information" but then serially lists in the disjunctive "knowledge, know-how, reverse know-how, documents, data, or other intellectual property of WIS." The list in the first sentence is simply a string of highly general terms that catalogs categories beyond that of the defined term of "Confidential Information."

Datascan argues that the vagueness of the language creates the situation where the FMEs are prohibited from using such things as "knowledge" of WIS and that so broad a term restrains them from using any knowledge they obtained in their prior employment whether proprietary or not and, in turn, prevents them from using general knowledge to engage in lawful activity. Datascan argues that this problem is compounded by the limited range of information that WIS claimed was proprietary, with the focus of the proof being on how to conduct a Walmart inventory. Thus,

74

generalized knowledge of how inventories of other WIS clients are performed may be swept up in the language of the injunction order without any proof that such should be considered protectable as proprietary information that the FMEs are prohibited from using in pursuing their livelihoods. We agree.

WIS offers two defenses to the challenged paragraph, both of which we reject. First, it argues that the limiting phrase "of WIS" at the end of the sentence provides sufficient guidance because "it prohibits [Datascan] from, among other things, using or disclosing confidential information '*of WIS*,' which would be unlawful." That argument begs the question whether generalized terms, such as "knowledge . . . of WIS," meet the specificity requirements of Rule 683 or clearly define that only proprietary information of WIS rather than some generalized knowledge obtained by an FME is off limits. The term "of WIS" may specify whose "knowledge" it is, but it is still a flawed general term leaving the restrained party to guess what constitutes knowledge.

WIS's next defense is that the injunction order provides the necessary specificity because "the [i]njunction's definition of 'Confidential Information' includes specifically defined categories of information and examples of items within those categories." That argument ignores the disjunctive structure of the sentence in question. As noted, it begins with the defined term "WIS Confidential Information" but then serially lists other general terms besides "WIS Confidential Information."

We conclude that the vague and general terms in paragraph b. of the injunction order fail to meet the specificity requirements of Rule 683 and potentially improperly restrain the FMEs from lawful activities.

We sustain Datascan's third subissue under its third issue.

**5.      We sustain Datascan's challenge to the injunction order because of its use of the phrase "including, but not limited to."**

Finally, Datascan in its fourth subissue under its third issue challenges the form of the injunction order because of the insertion of the phrase "including, but not limited to" primarily in paragraph b., which we just held is lacking specificity. As set forth above, that paragraph restrains Appellants from

> using, disclosing or transferring, or assisting or encouraging others to use, disclose[,] or transfer[] any WIS Confidential Information, knowledge, know-how, reverse know-how, documents, data, or other intellectual property of WIS, *including, but not limited to*, any WIS Confidential Information, knowledge, know-how, reverse know-how, documents, data[,] or other intellectual property that any [FME] received, maintained, developed[,] or had access to during or after the course of his or her employment at WIS . . . . [Emphasis added.]

Some cases conclude that the usage of "including, but not limited to" language is permissible, and some conclude that it is not. Obviously here each party relies on cases supporting its view of whether the injunction order is or is not vague because of the order's use of that phrase. It appears that the distinction between the permissible and impermissible use of the phrase lies in whether the phrase increases clarity or increases confusion. When the phrase clarifies by giving examples to explain a

76

generalized category that is made sufficiently specific when read in the context of the evidence in the record, it is permissible, but when the phrase confuses by suggesting undefined categories different than the category to which the phrase is appended, it is impermissible.

The following are examples of the first category, where the use of the phrase did not create an ambiguity that violated the specificity requirement of Rule 683:

- Although an injunction order included "'catch all' language, specific examples of confidential information were [also] given in the order." *Bellefeuille v. Equine Sports Med. & Surgery, Weatherford Div., PLLC*, No. 02-15-00268-CV, 2016 WL 1163364, at *7 (Tex. App.—Fort Worth Mar. 24, 2016, no pet.) (mem. op.). "These examples—when read in the context of [appellee's] counterclaims, the evidence at the hearing, and the fact that the trial court found that [appellant] was in possession of [appellee's] proprietary and confidential information—provided [appellant] with adequate notice of the information she is prohibited from using or disclosing." *Id.* (footnote omitted).

- An injunction order provided that "Confidential Information pursuant to this definition includes, but is not limited to[, various specific items listed]." *Lasser v. Amistco Separation Prods., Inc.*, No. 01-14-00432-CV,

2014 WL 4952501, at *6–7 (Tex. App.—Houston [1st Dist.] Oct. 2, 2014, no pet.) (mem. op.). The opinion concluded that

> the order makes clear the prohibited conduct by listing and describing specific categories and examples of information that comprise "trade secrets" and "confidential information." The specific examples of the items comprising "trade secrets" and "confidential information," when read in the context of the suit, provided [appellant] with adequate notice of the information that he is prohibited from using or disclosing.

*Id.* at *7.

- A court of appeals concluded that "the injunction is not impermissibly vague merely because it contains phrases such as 'including but not limited to'" but apparently modified the injunction order by striking the phrase from the paragraph that incorporated the definition of confidential information. *McCaskill*, 2018 WL 3154616, at *3.

The following are examples of the second category, where the use of the phrase created an ambiguity that violated the specificity requirement of Rule 683:

- An injunction order prohibited transfers from the bank account of a party, including but not limited to a specifically identified account. *In re Krueger*, No. 03-12-00838-CV, 2013 WL 2157765, at *3 (Tex. App.—Austin May 16, 2013, orig. proceeding). The restrained party was not provided with information to identify what the other accounts were, and

thus the injunction order failed to meet the reasonable detail requirement of Rule 683. *Id.*

- An injunction order restrained a party from "possessing, disclosing to any third party, or using for their own benefit or to the detriment of [either appellee] any of [either appellee's] Proprietary Information/Trade Secrets (including but not limited to proprietary information, confidential information, training materials, templates, or sales or customer lists)." *Ramirez*, 2013 WL 4568365, at *3. Other portions of the injunction order provided additional definitions, but they were "broad and general, such as 'techniques,' 'materials,' 'proprietary information,' and 'confidential information.'" *Id.* The Dallas Court of Appeals concluded that the

> provision of the injunction [prohibiting the use of Proprietary Information/Trade Secrets] does not define "Proprietary Information/Trade Secrets" with enough specificity to give appellants adequate notice of the acts they are restrained from doing. Instead, they must infer whether any particular information or item in their possession constitutes "proprietary information" or "confidential information" subject to the injunction.

*Id.* at *4.

- An injunction order prohibited the use of "'Confidential and Trade Secret Information,' which according to the injunction 'includes, but is not limited to,' a two-page list of items." *Cooper Valves, LLC v.*

79

*ValvTechnologies, Inc.*, 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Such an "open-ended" definition failed to meet the specificity requirements of Rule 683. *Id.*

We have already noted that there is a conspicuous lack of specificity in the paragraph that Datascan challenges. That vagueness is not improved but is instead compounded by the use of the phrase "including, but not limited to" and the clause that follows it. The first sentence lists highly general terms. Then the provision includes the phrase "including, but not limited to" and is followed by the same serial, disjunctive list but now has appended to the end of it the clause "that any [FME] *received, maintained,* developed[,] or *had access to during or after* the course of his or her employment at WIS." [Emphasis added.] Thus, the paragraph is so broad that it prohibits the use of "knowledge" that an employee "had access to" even if that access came after the course of employment. To parse what this may include seems an impossible task.

Again, as we have noted, the specific focus in the record of the confidential information that WIS is attempting to protect is the inventory processes that it developed for Walmart. The record provides no guidance regarding what the general terms used might mean for information with respect to other clients of WIS. As Datascan notes, there is an interchange of information between the clients such as Walmart and the inventory service. Exactly whose information is included in this interchange can be unclear. Datascan offers the following example of this quandary:

By way of example, WIS testified that Walmart shares amongst its inventory providers how they rank compared to one another. It is possible that the [t]emporary [i]njunction would prevent Datascan from receiving this information from Walmart when clearly it is not WIS's proprietary information. Similarly, WIS claimed that [it] worked for three years in conjunction with Walmart in developing Walmart's internal app. This app product may contain "*including but not limited to*, any WIS . . . knowledge, know-how, reverse know-how, documents, data, or other intellectual property," but WIS readily admits it is not [its] "confidential information." [Record references omitted.]

We agree that the wording of the injunction order makes it unclear whether Datascan is in jeopardy for using such information.

We conclude that the vague and general terms of paragraph b. in the injunction order are compounded by the use of the "including but not limited to" phrase, and that phrase provides another reason why the injunction order fails to meet the specificity requirements of Rule 683.

We sustain Datascan's fourth subissue under its third issue. Thus, we sustain its entire third issue.

### IV. Conclusion and Relief Granted

Having overruled Datascan's first and second issues, with the exception of remanding this matter to the trial court to determine whether the scope-of-activity covenants at issue should be modified before being made the subject of injunctive relief, and having sustained Datascan's third issue, we hold that the trial court did not abuse its discretion by issuing the temporary-injunction order but conclude the restraints do not meet the requirements of Rule 683.

With respect to how we will address the defects in the injunction order, we have previously noted that we may modify an injunction order that is overly broad or vague, if possible. *See Hernandez*, 2021 WL 520456, at *34. Here, in view of the need to possibly modify the scope of activity in the covenants compounded by the defects in the injunction order, we view the task as best left to the trial court. Therefore, with respect to paragraphs b., e., f., g., and h. of the injunction order's restraints, we reverse the injunction order and remand this case to the trial court for further proceedings consistent with this opinion.[23]

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: November 16, 2023

---

[23]We opt not to dissolve the injunction but remand for the trial court to address the deficiencies in the injunction order identified in this opinion. *See McCaskill*, 2018 WL 3154616, at *4 (concluding that the proper remedy is to remand to the trial court rather than to dissolve a temporary-injunction order to address the order's lack of specificity).